IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

MARK A. YACKO,                                    Case No. 1:23-cv-01578-PAB

        Plaintiff,

        -vs-                                      JUDGE PAMELA A. BARKER

GENERAL MOTORS COMPANY, *et al.*,

        Defendants.                               MEMORANDUM   OPINION   AND
                          ORDER

      This matter comes before the Court upon Defendant General Motors Company ("GM") and

Defendant Jim Gaeschke's[1] ("Gaeschke") Motion for Summary Judgment ("Motion") (Doc. No. 27),

filed on July 17, 2024.  On August 20, 2024, Plaintiff Mark A. Yacko ("Yacko") filed a Brief in

Opposition to Gaeschke's Motion to Dismiss ("Opposition") (Doc. No. 33), and on September 17,

2024, GM and Gaeschke (collectively "Defendants") filed a Reply Brief in Support of their Motion

("Reply").  (Doc. No. 37.)  Accordingly, Defendants' Motion is ripe for a decision.

      For the following reasons, the Court **GRANTS** Defendants' Motion.  (Doc. No. 27.)

I.     **Undisputed Material Facts**

    A.     **General Motors and Yacko's Employment at GM Parma**

      Defendant GM is a corporation headquartered in Detroit, Michigan, and operates a

manufacturing plant in Cuyahoga County, Ohio.  (Doc. No. 1-1, Compl. at ¶ 2; Sipler Dec. (Doc. 27-

9) at ¶ 2.)  Defendant GM is a person and employer within the meaning of Ohio Revised Code §

---

[1] Yacko's Complaint spells Gaeschke's name as "Gaeske."  (*See* Doc. No. 1-1.)  Gaeschke's filings, however, spell his name "Gaeschke."  (*See, e.g.*, Doc. No. 10-1.)  The Court will use Gaeschke's own spelling.

4112.01(A) and (B).  (Compl. at ¶ 3; Doc. No. 5, GM Ans. at ¶ 3; Doc. No. 20, Gaeschke Ans. at ¶ 3.)

Yacko is a sixty-year-old white male resident of Medina County, Ohio.[2]  (Compl. at ¶ 1; GM Ans. at ¶ 1; Gaeschke Ans. at ¶ 1; Yacko Dep. (Doc. No. 27-2) at Tr. 11, 14.)  Yacko began as a contract supervisor with GM in 1996 and was later hired full-time by GM in 1999 at GM's plant in Parma, Ohio (hereinafter "GM Parma") as a Group Leader in Maintenance.  (Yacko Dep. at Tr. 16–17.)  GM Parma is a stamping facility that manufactures parts for GM vehicles.  (Yacko Dep. at Tr. Sipler Dec. (Doc. 27-9) at ¶ 2.)  In 2022, Yacko reported to Frank Jewett ("Jewett"), his direct supervisor.  (Yacko Dep. at Tr. 18.)  Jewett reported to Ken Sipler ("Sipler"), the Area Manager. (Dixon Dec. (Doc. No. 27-6) at ¶ 8.)

A Group Leader in Maintenance at GM Parma is responsible for supervising a group of skilled employees to troubleshoot and repair complex equipment and processes.  (Yacko Dep. at Tr. 20.)  In his role, Yacko supervised anywhere from nine to fifteen maintenance employees on GM's third shift, which operated 10:30 p.m. to 6:30 a.m.  (Yacko Dep. at Tr. 17, 20–21; Sipler Dec. at ¶ 2.)

GM expects employees to comply with a set of standards known as "GM Behaviors."  (Yacko Dep. at Tr. 57–58; Dixon Dec. at ¶ 3; Sipler Dec. at ¶ 4.)  The GM Behaviors are published on GM's employee website and consist of eight criteria as follows:  Be Inclusive, Think Customer, Innovate

---

[2] Yacko was born on March 2, 1964, and was 58 years old at the time of his termination on February 28, 2023—specifically, two days shy of turning 59 years old.  (Yacko Dep. (Doc. No. 27-2) at Tr. 11.)  For purposes of evaluating Yacko's age discrimination claim, the Court will use his age at the time of the termination.  *See Grace v. Ansul, Inc.*, 2001 WL 765132, at *3 (N.D. Ill. July 6, 2001) ("It is of course the universally-established law that it is the honest perception of the decisionmaker at the time of an adverse employment decision that controls whether or not prohibited discriminatory motives are at work."); *Turner v. Kan. City So. Ry. Co.*, 675 F.3d 887, 893 (5th Cir. 2012) ("The relevant perspective is that of the employer at the time of the adverse employment decision.") (citation omitted); *Cousin v. United States*, 230 F. Supp. 3d 475, 490 (E.D. Va. 2017) ("[A]s in other employment discrimination contexts, the Court's task is to assess the employment decision from the perspective of the employer at the time the decision was made.") (citing *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)).

Now, Look Ahead, One Team, Be Bold, It's on Me, and Winning With Integrity. (Doc. No. 27-6 at PageID #578; Yacko Dep. at Tr. 58.) GM employees are evaluated, in-part, on whether they meet the GM Behaviors standards. (Dixon Dec. at ¶ 3; Sipler Dec. at ¶ 6; Yacko Dep. at Tr. 57.)

GM maintains an Equal Employment Opportunity Policy ("EEO Policy"). (Doc. No. 27-2 at PageID #347.) The EEO Policy requires GM to extend opportunities on an equal basis to employees regardless of demographics, including age. (*Id.*) GM also maintains an Anti-Harassment Policy. (*Id.* at PageID #348.) The Anti-Harassment Policy similarly prohibits any harassment based on various demographics, including age, sex, or gender. (*Id.*) Specifically, the Anti-Harassment Policy notes that words and actions that "have even the appearance of disrespect … are inappropriate for the GM work environment." (*Id.*) The Anti-Harassment Policy further provides that "[d]emeaning, disrespectful, or insensitive jokes … [or] language … will not be tolerated in the workplace," "particularly if they relate to race, sex, [or] gender." (*Id.*)

### B. Yacko's Performance in 2021 and 2022

Yacko was a strong performer regarding his technical skills. For example, GM leadership described Yacko as having a "deep understanding on how the Parma Plant presses operated and how to maintain and repair them." (Sipler Dec. at ¶ 6.) Similarly, in Yacko's 2021 Year-End Performance Review, his supervisor at the time, Jewett, described him as "a valuable member of the 3rd shift team" whose "pressroom knowledge and experience is invaluable." (Doc. No. 27-2 at PageID #350.)

Despite Yacko's strong technical skills, his "soft skills"—in other words, "how he worked and interacted with his peers and leaders"—did not receive the same praise. (Sipler Dec. at ¶¶ 6–9; Jewett Dec. (Doc. No. 27-8) at ¶¶ 2–5.) For example, in Yacko's 2021 Year-End Performance Review, Jewett explained that Yacko "is bold, but he needs to be careful with [sic] his constructive

3

criticisms do not cross the line and take away from all the good work he does." (Doc. No. 27-2 at PageID #353.)

In 2022, Yacko's behavior became a topic of discussion between Yacko and GM management. (Sipler Dec. at ¶¶ 6–9; Jewett Dec. at ¶¶ 2–5; Yacko Dep. at Tr. 49.) Specifically, two aspects of Yacko's behavior were raised as concerns by GM management: (i) Yacko's attendance; and (ii) the way he interacted with his peers and leaders. (*Id.*)

### i. Yacko's 2022 Attendance

In 2022, Yacko called off several times throughout the year. In early January 2022, the first attendance incident occurred when Yacko called off work on short notice because he was stuck in an ice storm while traveling back from vacation. (Yacko Dep. at Tr. 76–78; Doc. No. 27-2 at PageID #361.) GM was specifically concerned with the short notice provided that prevented them from finding coverage to fill Yacko's role and lack of explanation when calling off.[3] (Sipler Dep. at Tr. 32–33.) On April 19, 2022, Yacko's second attendance incident occurred, when he called off the same day as his shift because "something had come up at home."[4] (Doc. No. 27-2 at PageID #361.)

---

[3] There are a few details in dispute as to the January attendance issue. First, the parties dispute the number of days that Yacko called off. GM management emails indicate that Yacko called off on both January 3, 2022, and January 4, 2022. (Sipler Dep. at Tr. 32; Doc. No. 27-2, PageID #361.) Yacko disputes this in his deposition, explaining that he "only took one more day off after I had scheduled time off," and explained that perhaps Jewett thought that the "first day wasn't scheduled" even though it was. (Yacko Dep. at Tr. 77–78, 81.) Second, the parties dispute the timing of how far in-advance Yacko called off and whether he provided a reason. GM asserts that Yacko waited until an hour before the start of the shift to contact his supervisor and gave no reason for calling off. (Sipler Dep. at Tr. 32; Doc. No. 27-8 at PageID #638.) Yacko addresses this in his deposition, testifying that he cannot recall if the details were included in a text message but that he "did call [Jewett] and leave him a message and let him know" about the ice storm. (Yacko Dep. at Tr. 76.) Yacko also stated that he "believe[s] it was earlier than an hour before the shift." (*Id.*) After reviewing the record, it appears that Yacko initially contacted Jewett via text message to call off, and later supplemented that message with a call to explain the circumstances. (*Compare* Doc. No. 27-2 at PageID #361, *with* Yacko Dep. at Tr. 76.)

[4] In his deposition, Yacko appears to have initially confused his dates, as he testified that the April call-off was because his wife's aide was shot. (Yacko Dep. at Tr. 78.) But after being asked about the May call-off, Yacko clarified that his wife's aide was actually shot on May 3, 2022, and that he did not recall calling off on April 19, 2022. (Yacko Dep. at Tr.

On May 3, 2022, Yacko called off again for a family emergency because he needed to stay home and comfort his distraught wife after one of her young office aides was murdered that day.[5]  (Yacko Dep. at Tr. 28–29, 50.)  These call-offs were documented by Jewett and were later provided to Sipler.[6] (Jewett Dec. at ¶ 3; Doc. No. 27-8 at PageID #638; Doc. No. 27-2 at PageID #361.)

On May 5, 2022, Jewett and Sipler met with Yacko to discuss attendance expectations. (Jewett Dec. at ¶ 4; Doc. No. 27-2 at PageID #360; Yacko Dep. at Tr. 80.)  Yacko was very upset during the meeting and stated that if he has more emergencies such as family or medical issues, he is going to call off.  (Yacko Dep. at Tr. 82–83; Doc. No. 27-2 at PageID #360; Jewett Dec. at ¶ 4; Sipler Dec. at ¶ 9.)  At the meeting, Sipler stressed to Yacko the importance of letting Jewett know as early in advance as possible if he has family issues.  (Sipler Dec. at ¶9.)  In response, Yacko told Sipler and Jewett that he was going to do "whatever the fuck he wanted to do" with his vacation days.  (Sipler Dep. (Doc. No. 32-6) at Tr. 34.)  Jewett described Yacko as "quite belligerent," "heated," and "angry" during the meeting, while Sipler described him as "angry," "combative," and "aggressive."  (Jewett Dep (Doc. No. 32-5) at Tr. 32; Sipler Dec. at ¶ 9.)  According to Sipler, Yacko turned his chair and sat with his back to Sipler and Jewett multiple times.  (Id.)  Finally, Sipler noted that Yacko "had a

---

79.)  Yacko later appeared to concede that he did call off on April 19, 2022, but still did not recall why he did so.  (Yacko Dep. at Tr. 81.)

[5] Yacko also testified that the health of his mother would sometimes cause him to miss work unexpectedly.  (Yacko Dep. at Tr. 29–30.)  Specifically, Yacko's mother had dementia and would sometimes become confused, which required Yacko to go to her home and care for her.  (Id.)  Neither Yacko nor the GM management emails mention any specific dates that this occurred.  (Id.; Doc. No. 27-2 at PageID #361.)  The record is unclear as to whether Yacko's April 19, 2022 call-off for "something [that] had come up at home" was related to his mother's health.  (Doc. No. 27-2 at PageID #361.)  Yacko considered both the situation regarding his wife's aide and his parents' health to be emergencies.  (Yacko Dep. at Tr. 29.)

[6] On September 29, 2022—following Yacko's 2022 Mid-Year Report—Yacko called off via email because his family in Florida had been impacted by Hurricane Ian and were in dire need of assistance.  (Doc. No. 27-2 at PageID #370.)  Yacko indicated that he would be out at least a week but did not have an exact time for return.  (Id.)  The email was sent to Jewett, Sipler, and Craig Malone ("Malone") who was the lead on third shift.  (Id.)  Malone responded via email informing Yacko that "[y]ou have my full support" and "hope everything is ok with your family."  (Id.)

hot cup of coffee in his hands … [which] were shaking," and that he thought Yacko was either going to punch him or throw the coffee at him which made him fearful for his safety.  (Sipler Dep. at Tr. 34.)

### ii.  Yacko's Interactions With Co-Workers[7]

The way Yacko interacted with his co-workers was addressed on various occasions throughout 2022.  For example, in early 2022, Yacko was asked to make a short presentation about himself called a "10-minute drill" to share with the staff at HRM[8] so they could get to know him better.  (Yacko Dep. at Tr. 48; Sipler Dec. at ¶ 7; Jewett Dep. at Tr. 16.)  During the presentation, Yacko was asked a question[9] about himself by the Assistant Plant Manager, Amy Carrier ("Carrier").  (Sipler Dep. at Tr. 13; Sipler Dec. at ¶ 7.)  In response to Carrier's question, Yacko answered that he was a "man" and therefore a "hunter and gatherer."  (Sipler Dep. at Tr. 16; Sipler Dec. at ¶ 7.)  Carrier told Sipler that she felt offended by Yacko's remark, although Sipler himself did not know why it would be offensive to her,[10] what Yacko meant or intended by the comment, or whether Yacko meant it in a

---

[7] In addition to the following examples discussed, Sipler testified in his deposition that Yacko would not keep his manager, Jewett, informed of breakdowns occurring in the plant.  (Sipler Dep. at Tr. 38–39.)  However, Sipler later acknowledged that he was not there on third shift and did not know the specifics of the situation.  (Sipler Dep. at 39–40.)  Sipler also claimed that Yacko was taken off a project for a press rebuild for not completing follow-up information at the end of the shift and not communicating the progress of the press—yet when challenged as to the details of those incidents, Sipler could not provide any information.  (Sipler Dep. at 44–45.)

[8] GM Parma's HRM leadership team is comprised of the Plant Director (i.e., Gaeschke), the Assistant Plant Manager (i.e., Carrier), the Site Director – Human Resources-Labor Relations (i.e., Dixon), the Global Supply Chain Manager, the Manufacturing Engineering Manager, and the Finance Manager.  (Dixon Dec. at ¶ 8.)  GM Parma's SubHRM team is comprised of eighth level direct reports to the HRM team, which included Sipler.  (*Id.*)  Shift leads such as Yacko and Jewett are not members of the HRM or SubHRM teams and did not attend the HRM/SubHRM Meeting.  (*Id.*)

[9] The record does not specify the exact question that Carrier asked Yacko.

[10] Yacko contends that the Court cannot consider Sipler's Declaration on the point of whether the "hunter and gatherer" comment was offensive because it is in "direct contradiction" to his deposition testimony.  (Opposition at PageID #1326.)  The Sixth Circuit has repeatedly indicated that "[a] party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts [his] earlier deposition testimony."  *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986).  In determining an affidavit's admissibility at summary judgment,

6

sexist way or meant to create an offensive feeling in the mind of Carrier.[11]  (Sipler Dep. at Tr. 16–17, 20.)  Carrier, along with Jewett, later met with Yacko and explained to him that she felt attacked by his comments and informed him that others perceived him as being negative, to which Yacko responded "I'm sorry if I come off like a negative person, but I am who I am."[12]  (Jewett Dep. at Tr. 15–16, 52, 54–55; Yacko Dep. at Tr. 48, 93.)

The next incident involved Yacko's response to an email from a co-worker requesting coverage.  On June 22, 2022, Trelena Carmack ("Carmack"), a fellow group leader in maintenance,

---

courts must first consider "whether the affidavit 'directly contradicts the nonmoving party's prior sworn testimony,'" and, "[i]f so, absent a persuasive justification for the contradiction, the court should not consider the affidavit."  *Reich v. City of Elizabethtown*, 945 F.3d 968, 976 (6th Cir. 2019) (citation omitted).  Sixth Circuit precedent suggests "a relatively narrow definition of contradiction."  *Briggs v. Potter*, 463 F.3d 507, 513 (6th Cir. 2006).  If a party "was not directly questioned about an issue," a later affidavit on that issue simply "fills a gap left open by the moving party."  *Aerel, S. R. L v. PCC Airfoils, LLC*, 448 F.3d 899, 907 (6th Cir. 2006).  Here, Sipler was asked directly in his deposition to explain how "anything [Yacko] said to Carrier about being a hunter [or] gatherer" could be offensive.  (Sipler Dep. at Tr. 20.)  In response, Sipler answered, "I do not know why that would be offensive to her."  (*Id.*)  Yet in his later declaration, Sipler declared that "I found the response odd and *disrespectful* to Ms. Carrier."  (*Id.*) (emphasis added).  Therefore, because Sipler directly testified that he did not know why such a comment would be offensive, and later contradicted that testimony by stating that he believed the comment was in-fact disrespectful, the Court will not consider Sipler's declaration as to *his* perception of the "hunter and gatherer" comment being offensive.

However, the Court will consider Sipler's testimony that Carrier said she felt offended, and Jewett's testimony that Carrier said she felt attacked, by Yacko's remark.  (Sipler Dep. at Tr. 16–17; Jewett Dep. at Tr. 52.)  Federal Rule of Evidence 803(3) provides an exception to the rule against hearsay regarding a statement of the declarant's then-existing statement of mind or emotional condition.  *See* Fed. R. Evid. 803(3).  Here, Carrier's statements that she felt offended and attacked by Yacko's comment described her emotional condition, and thus, are admissible under Rule 803(3).  (Sipler Dep. at Tr. 17; Jewett Dep. at Tr. 16, 52, 54–55.)  Further, Yacko did not raise any hearsay objections to this testimony.

[11] Yacko argues that Sipler approved his presentation plan before he gave it to Carrier.  (Opposition at PageID #1326; Sipler Dep. at Tr. 25.)  However, the Court finds that such approval does not equate to Sipler approving Yacko's comments about being a "man" and "hunter and gatherer" because the evidence does not support that those comments were *in* the PowerPoint presentation itself.  Instead, the evidence appears to indicate that while presenting his PowerPoint, Yacko was asked a question by Carrier, to which he then *responded* with the "hunter and gatherer" comment—rather than the comment already being pre-written into the PowerPoint.  (Sipler Dep. at Tr. 16.)  Accordingly, the Court finds that the evidence does not support the notion that Sipler approved the "hunter and gatherer" comment upon his review of Yacko's PowerPoint.

[12] In his deposition testimony, Yacko describes a meeting with Carrier in which he was informed that others perceived him as negative.  (Yacko Dep. at Tr. 48, 93.)  The record is unclear whether this is the same meeting referenced by Jewett, in which Carrier discussed Yacko's "hunter and gatherer" comments.  (Jewett Dep. at Tr. 15–16.)

emailed Yacko and other third-shift group leaders a request to work on Saturday, June 25, 2022.

(Yacko Dep. at Tr. 78; Jewett Dec. at ¶ 5.)  In her email, Carmack wrote, "I am on vacation Friday

and won't be able to work Saturday if they work.  Sounds like same as last week 2 cells in Dept 50.

Who would be able to work if we do?"  (Doc. No. 27-8 at PageID #640.)  Yacko's response was as

follows:

> "You'd have to ask my wife (Michelle) if I'm available for Saturday.  I'd ask her, but I'm
> afraid of her response.  239-699-5822, best time to reach her is between 8:00am and 11:00am.
> I'm kind of hoping we don't work, I dreed [sic] just thinking about how she'll respond.  Keep
> in mind, I tell her EVERYTHING about my workplace and leadership."

(*Id.*).  Afterwards, Carmack became very upset and reached out to Jewett to say that she felt insulted,

demeaned, and disrespected by Yacko's response.[13]  (Jewett Dep. at Tr. 44–45, 47–48.)  Jewett did

not ask Carmack why she felt insulted, but instead told her that if she felt offended, she should report

the incident to the lead, Sipler.[14]  (Jewett Dep. at Tr. 48, 51, 55–57.)

Jewett met with Yacko to discuss the incident and provide him with a coaching-counseling

memo that explained why his email to Carmack was inappropriate.  (Doc. 27-8 at PageID #639–40.)

The coaching-counseling memo specified that it was not a letter to file for formal discipline.  (Doc.

---

[13] During Jewett's deposition, Plaintiff's counsel asked Jewett whether he was aware and if it was true that Carmack was seen laughing and joking about this in front of three witnesses after making the report.  (Jewett Dep. at Tr. 50, 57.) Defense counsel objected to the line of questioning on the basis that it assumed facts not in evidence.  (Jewett Dep. at Tr. 57.)  Plaintiff's counsel insisted that such facts were in evidence.  (*Id.*)  In response to the question, Jewett answered "I don't know."  (Jewett Dep. at Tr. 58.)  Upon an independent review of the record, the Court does not find any references in evidence to Carmack "laughing and joking" about the incident.  The only reference to this event comes from Plaintiff's counsel in his question during Jewett's deposition, in which Jewett responds that he does not know whether it occurred. (*Id.*)  Yacko points to no other deposition testimony or any other evidence that corroborates this event.  Nor does Yacko provide any declarations from the "three witnesses" in front of whom Carmack allegedly laughed and joked.  Therefore, because Jewett did not affirm that Carmack was laughing and joking about the incident, and it is not mentioned anywhere else in the record aside from counsel's question during Jewett's deposition—which does not constitute evidence in and of itself—the Court finds that no evidence exists to establish that Carmack was laughing and joking about the incident.

[14] When asked multiple times why Carmack was offended, Jewett responded that he could not speak for her and that Carmack should be asked directly.  (Jewett Dep. at Tr. 45, 47–48, 55–56.)

27-8 at PageID #640.)  When asked his own opinion as to the offensiveness of the comment, Jewett testified that there was no reason to include the comment "I tell her everything about my workplace and leadership . . . unless you are trying to threaten somebody."  (Jewett Dep. at Tr. 45.)  Further, Jewett indicated that he had never received an email like that when asking Yacko to work the weekend.  (Jewett Dep. at Tr. 53.)  Jewett never asked Yacko whether he meant to insult or threaten Carmack and could not confirm Yacko's intentions.  (Jewett Dep. at Tr. 45.)

In their depositions, Sipler and Jewett were asked whether each of these various incidents were grounds for terminating Yacko, to which they responded "no."  (Sipler Dep. at Tr. 26–29; Jewett Dep. at Tr. 17.)  Sipler did not know what was used as grounds to terminate Yacko's employment, nor did he talk to anyone about why Yacko should be terminated.  (Sipler Dep. at 29.)

### C.    Yacko's 2022 Mid-Year Performance Review

In 2022, Yacko received a mid-year performance review ("2022 Mid-Year Review") from his manager, Jewett.  (Yacko Dep. at Tr. 43–44; Doc. No. 27-2 at PageID #354–57.)  GM's mid-year review includes narratives from the employee's direct supervisor regarding the employee's performance for the first half of the year, as well as a narrative from the employee themselves reflecting on their own performance.  (Dixon Dec. at ¶ 6.)  At that time, GM used a nine-box evaluation system to rank their employees.[15]  (Yacko Dep. at Tr. 88; DeWildt Dep. at Tr. 93.)  Yacko testified that he believed about "90 percent" of employees ended up in the five box.  (Yacko Dep. at Tr. 89.)  Yacko explained that the five box "means you're doing your job.  You're not exceptional,

---

[15] When asked whether being in the nine box was the highest performance, Yacko responded that he believed a five was the best score, noting that it was a "weird" scale in that "one is not the worst, and nine is not the best."  (Yacko Dep. at Tr. 89.)

but you're doing your job." (*Id.*)  In his 2022 Mid-Year Review, Yacko received a four rating, which he interpreted as "less than being in the five box." (*Id.*)  In the 2022 Mid-Year Review, when asked to describe Yacko's accomplishments that demonstrate the impact Yacko made to GM, Jewett praised Yacko's technical-skills and abilities:

> "[Yacko's] greatest strength is his knowledge of the pressroom and his ability to motivate the trades.  He has the respect of his team members.  Be more involved with GMS, take on other responsibilities not directly related to his maintenance role.  Mark is a seasoned supervisor who has the ability to perform very effectively when he wants to."

(Doc. No. 27-2 at PageID #356.)  However, when asked to describe specific examples of how GM Behaviors were demonstrated as areas of strength and/or opportunity, Jewett described Yacko as follows:

> "Be Inclusive, dismisses opinions contrary to his own.  Think customer, does not appropriately follow up with customers.[16]  Look ahead, does not align his work with the overall business strategy.  One Team, misses deadlines and does not share information.  Be bold, generally resistant to change.  I've been in three separate meetings with [Yacko] since the beginning of the year, one with the assistant plant manager, one with my superintendent, and the other was with me, as his direct report.  Two of the meetings dealt with how he was perceived by others and one for his attendance.  [Yacko's] technical ability or his performance of getting the most out of his team has never been question.  I look forward to [Yacko] finishing the year strong."

(*Id.*)  Yacko's written response to the 2022 Mid-Year Review reads as follows:

> "What once I thought were my strengths have now been identified as my areas of opportunity.  I'm a square peg being forced into a round hole.  Slowly my edges are being rounded off, but it appears to be a long confusing process.  I'm trying to find my place in this cultural evaluation the company is under going [sic].  I always strive to achieve positive results when it pertains to all of GM's Behaviors.  Looking for a strong finish to this year."

(*Id.*)  Upon receiving his 2022 Mid-Year Review, Yacko reviewed it and discussed it with Jewett.

(Yacko Dep. at Tr. 34–35, 44–45.)  Yacko asked whether Jewett would change things that Yacko did

---

[16] "Customers" refers to co-workers, such as the other leaders and employees of the Maintenance Department that Yacko and his team served at GM Parma.  (Dixon Dep. at Tr. 42–43; Yacko Dep. at Tr. 40.)

10

not agree with, to which Jewett responded that he would not.  (Yacko Dep. at Tr. 45.)  Yacko then responded, "well, then I don't need a conversation with you about it."[17]  (*Id.*)  According to Jewett, Yacko also said that he "didn't give a fuck what [Jewett] wrote in the review."[18]  (Jewett Dec. at ¶ 6; Jewett Dep. at Tr. 23.)

### D.    New Plus/Par/Minus Scale and End-of-Year Performance Review Process

In the second half of 2022, GM changed its performance rating system corporate-wide from a nine-box rating scale to a three-box rating scale, with employees receiving either a plus, par, or minus rating.  (DeWildt Dep. (Doc. No. 27-4) at Tr. 93; Dixon Dep. (Doc. No. 27-3) at Tr. 62–63.)  According to GM, the purpose of the three-box scale was to provide further clarity to employees around how they were performing, because the previous nine-box scale made it difficult for employees to connect performance with the many options under which they were rated.[19]  (DeWildt Dep. at Tr. 93–94; Dixon Dep. at Tr. 62–63.)

---

[17] In his deposition, Yacko goes on to assert that Jewett's comments in the 2022 Mid-Year Review were false.  (Yacko Dep. at Tr. 46.)

[18] Following Yacko's 2022 Mid-Year Review, Jewett believed that Yacko's performance improved for the second half of 2022.  (Yacko Dep. at Tr. 87–88; Jewett Dec. at ¶ 7.)  However, during his deposition, Yacko did not agree with Jewett's assertion that Yacko's performance improved because he believed that his "performance was the same the entire year," and that while he may have been "perceived differently, … [he] did the same thing … at the beginning of the year as [he] did at the end of the year."  (*Id.*)

[19] Yacko asserts that GM's change to the three-box scale was a staged event to make it easier to label employees with a minus and fire them.  (Opposition at PageID #1330.)  However, Yacko points to no evidence to support this assertion.  To the contrary, Yacko's deposition testimony demonstrates the lack of clarity with the nine-box scale and supports GM's assertion that the three-box scale was meant to make ratings easier for employees to understand.  For example, when asked whether the nine box was the highest performance, Yacko initially answered "no, I don't know how it goes."  (Yacko Dep. at Tr. 88–89.)  Yacko then testified, "five, I think is the best.  I don't know … No, one is not the worst, and nine is not the best.  If you see it, you'd see that … It's weird the way it goes."  (Yacko Dep. at Tr. 89.)  Immediately afterwards, Yacko then explained that the five box—which allegedly was the "best"—simply means "you're doing your job.  You're not exceptional, but you're doing your job."  (*Id.*)  Then, when Yacko was asked for his interpretation of being placed in the four box, he answered, "it was less than being in the five box."  (*Id.*)  Later in his deposition testimony, Yacko noted that GM said they changed the ratings scale from the nine box to a "more simpler method."  (Yacko Dep. at Tr. 92.)

11

Annual reviews for GM managers involved a process called "calibration."  Calibration refers to a discussion among the HRM and SubHRM leaders regarding an employee's performance.  (DeWildt Dep. at Tr. 105–106; Dixon Dep. at Tr. 65–66.)  This discussion may involve the employee's performance relative to results, and/or behaviors, and may include an HR representative or peers of leaders who also have employees performing the same type of work.  (DeWildt Dep. at Tr. 106; Dixon Dep. at Tr. 65–66.)  Performance is evaluated with respect to goals, relativity to peers, and any specific circumstances that may have come up within an environment that provided additional complexity for an employee.  (*Id.*)  While all employees at GM Parma are discussed, there is a focus on those who were exceeding expectations and those whose performance was less than satisfactory.  (Dixon Dep. at Tr. 65–66; Gaeschke Dep. (Doc. No. 27-5) at Tr. 47, 54–55.)

Calibration discussions for annual reviews typically occur toward the end of the year.  (Gaeschke Dep. at Tr. 54.)  First, the HRM and SubHRM teams meet to discuss GM Parma manager performances and reach a consensus as to their performance ratings ("HRM/SubHRM Meeting").  (Gaeschke Dep. at Tr. 47, 53–56, 58; Dixon Dep. at Tr. 66–69; DeWildt Dep. at Tr. 30.)  Afterwards, the HRM team meets alone to confirm that the performance ratings are accurate before officially submitting the ratings ("HRM Meeting").  (Gaeschke Dep. at Tr. 47, 53–56.)

### E.  Yacko's 2022 End-of Year Performance Minus Rating

Sipler took various steps to prepare for the HRM/SubHRM meeting.  (Sipler Dec. at ¶¶ 11–12; Gaeschke Dep. at Tr. 54.)  First, in mid-October 2022, Sipler met with Jewett to discuss Yacko's 2022 performance.  (Sipler Dec. at ¶ 11; Doc. No. 27-9 at PageID #657–59.)  Sipler instructed Jewett to bring all his notes to the meeting for discussion.  (Doc. No. 27-9 at PageID #659.)  Next, following the meeting with Jewett, Sipler prepared a form documenting the reasons for assigning Yacko a team

12

GM minus rating for his 2022 performance.[20]  (Sipler Dec. at ¶ 12; Doc. No. 27-9 at PageID #661–63.)  Then, Sipler emailed the form to Jewett for his review, and invited Jewett to add to the form as appropriate.  (Doc. No. 27-9 at PageID #660.)  Jewett did not add anything to the form.[21]  (Jewett Dep. at Tr. 63–64.)

In mid-November 2022, GM management met for the HRM/SubHRM Meeting.  (Gaeschke Dep. at Tr. 54.)  The HRM/SubHRM Meeting lasted approximately two hours.  (Dixon Dep. at Tr. 69.)  During the HRM/SubHRM Meeting, the performance of all the managers at GM Parma was discussed, which amounted to over 120 employees.  (Dixon Dep. at Tr. 68–69, 71–72.)  Discussions at the HRM/SubHRM Meeting focused on managers who were either exceeding expectations or whose performance was less than satisfactory.[22]  (Dixon Dep. at 65–66; Gaeschke Dep. at 54–55.)

---

[20] Yacko asserts that Jewett's deposition testimony proves that GM manufactured evidence with respect to Sipler's GM plus or minus form.  (Opposition at PageID #1321.)  In his deposition, Jewett testified that he did not believe that bates no. doc. 002385 was originally part of bates no. doc. 002384 and 002386 because the former is from the old rating system, while the latter is from the new rating system.  (Opposition at PageID #1321; Jewett Dep. at Tr. 68–69.)  Upon a closer review, it appears that bates no. doc. 002385 (Doc. No. 27-9 at PageID #662) appears to be a zoomed-in copy of Exhibit F from Yacko's deposition.  (Doc. No. 27-2 at PageID #358.)  It is unclear to the Court whether Sipler originally included this page as part of his materials in preparation for the HRM/SubHRM Meeting.  During Yacko's deposition, upon introduction of Exhibit F, Yacko's counsel indicated that Exhibit F was created by counsel for litigation purposes, to which GM's counsel responded that there was no basis for that accusation.  (Yacko Dep. at Tr. 65–66.)  Yacko's counsel then stated on the record, "Move to strike Exhibit F."  (Yacko Dep. at Tr. 67.)  Construing genuine issues of fact in light of the non-moving party, the Court shall disregard Exhibit F, and shall presume that bates no. doc. 002385 was not attached to Sipler's prepared documentation.  Nonetheless, as explained later in this Opinion, the Court's conclusion is unaffected by this result because Sipler had sufficient documentation prepared for the HRM/SubHRM Meeting and sufficient knowledge of Yacko's performance through his meetings and correspondence with Jewett.

[21] During his deposition, and after he had indicated that he did not add anything to the form, Jewett was explicitly asked whether he had wanted to add something to the form but did not.  (Jewett Dep. at Tr. 64.)  Jewett answered, "no."  (*Id.*)

[22] Yacko asserts that his performance was only discussed for one minute at the HRM/SubHRM Meeting, based on an even distribution of time for 120 employees being reviewed within two hours.  (Opposition at PageID #1318.)  However, the evidence in the record supports that the time spent discussing each manager was not equally distributed.  Both Dixon and Gaeschke testified that the discussions were particularly focused on employees who were either exceeding expectations or whose performance was less than satisfactory.  (Dixon Dep. at Tr. 65–66; Gaeschke Dep. at Tr. 47, 54–55.)  The record reflects that twenty-four employees received a plus rating, while two employees received a minus rating.  (Doc. No. 27-6 at PageID #571–77.)  Thus, in light of Dixon and Gaeschke's deposition testimony, it appears that the HRM/SubHRM Meeting focused discussions on these twenty-six employees who received either a plus rating or minus rating, more so than the remaining employees who all received a par rating.  (Dixon Dep. at Tr. 65–66; Gaeschke Dep. at Tr. 47, 54–55;

13

At the HRM/SubHRM Meeting, GM leadership conducted a calibration discussion of Yacko's annual performance.  (Dixon Dep. at Tr. 65–66; DeWildt Dep. at Tr. 30–37; Sipler Dec. at ¶ 13.)  Sipler, having prepared in advance to discuss examples of Yacko's performance to support a minus rating, led the discussion about Yacko's performance[23] based on his own observations and feedback, as well as those shared by Jewett and others.  (Sipler Dec. at ¶ 13; Dixon Dep. at Tr. 69–72; Gaeschke Dep. at Tr. 58.)  Any leaders who had a strong opposition to the discussion were encouraged to provide factual documentation to support their opposition.  (Dixon Dep. at Tr. 70.)  Although GM leadership felt that Yacko's performance improved in the latter half of 2022, a consensus[24] was reached that Yacko would be assigned a teamGM minus rating because he did not meet expectations for the entire year.  (Sipler Dec. at ¶ 13; Doc. No. 27-9 at PageID #661; Jewett Dec. at ¶ 7; Dixon Dep. at Tr. 66–71; DeWildt Dep. at Tr. 83; Gaeschke Dep. at Tr. 20.)  Neither termination nor age

---

Doc. No. 27-6 at PageID #571–77.)  This conclusion is further supported by reviewing Sipler's "TeamGM Plus or Minus Business Case – 2023" template.  (Doc. 27-9 at PageID #661.)  That template contains a box for "TeamGM Plus Nomination" and "TeamGM Minus Nomination" but contains *no* listing for a teamGM par rating—thus underscoring the emphasis for discussion on either high or low performers rather than those who received a par rating.  (*Id.*)  Finally, when Plaintiff's counsel represented to Gaeschke that the amount of time spent on Yacko at the HRM/SubHRM Meeting was "30 seconds," Gaeschke testified that he believed that to be inaccurate.  (Gaeschke Dep. at Tr. 46.)  Accordingly, because Yacko has failed to produce evidence to the contrary, the Court rejects the assertion that Yacko's performance was discussed for only one minute at the HRM/SubHRM Meeting.  (Opposition at PageID #1318.)

[23] Yacko contests that Sipler led a thoughtful discussion regarding his performance during the HRM/SubHRM Meeting.  However, as explained further below, the Court rejects Yacko's argument that Sipler could not have led a thoughtful discussion based on the amount of time spent discussing Yacko's performance because the record does not support that his performance was only discussed for one minute.  *See supra* note 22.

[24] Yacko asserts that Dixon refused to explain how the decision was reached to give Yacko a minus rating at the HRM/SubHRM Meeting.  (Opposition at PageID #1318.)  In her deposition, Dixon simply testified that there was no formal mechanism for polling or registering of votes—instead, managers came prepared to discuss each employee's examples of their performance that would support a certain rating, and if anyone had strong opposition, they were encouraged to support their opposition with evidence.  (Dixon Dep. at Tr. 69–72.)  The fact that formal votes were not counted at the meeting is irrelevant, as a consensus can still be reached by way of discussion absent formal voting.  (Dixon Dep. at Tr. 66–71.)

14

was discussed at the HRM/SubHRM Meeting with regards to Yacko or any other GM employee. (Dixon Dec. at ¶ 10; Sipler Dec. at ¶ 13; Gaeschke Dep. at Tr. 36.)

In mid-November 2022, following the HRM/SubHRM Meeting, Sipler met with Jewett to discuss the decision from the HRM/SubHRM Meeting to issue Yacko a teamGM minus rating, and the ratings for the other members of Jewett's team. (Sipler Dec. at ¶ 14; Doc. No. 27-9 at PageID #664.) Sipler asked Jewett to update Workday, the Company's human resources information system, with the ratings, which he did.[25] (Sipler Dec. at ¶ 14; Dixon Dep. at Tr. 72.) Shortly after, the HRM team met to confirm the rankings from the HRM/SubHRM Meeting. (Gaeschke Dep. at Tr. 55–56.)

**F.   CNN January Article and Performance Separation Program for Firing Minuses**

---

[25] Yacko cites to Sixth Circuit precedent for the assertion that if an employer "cannot even give a straight answer" as to who recommended the employee for termination, a reasonable jury could infer that the employer "is trying to hide something." (Opposition at PageID #1331) (citing *Coburn v. Rockwell Automation, Inc.*, 238 F. App'x 112, 122 (6th Cir. 2007)). Specifically, Yacko attempts to create a factual issue regarding the issue of who exactly gave Yacko the teamGM minus rating. Upon an independent review of the record, the Court finds that no such factual issue exists. First, Yacko asserts that Jewett denied giving Yacko a minus review. (Opposition at PageID #1322.) Yet, during his deposition, Jewett was never asked whether he gave Yacko a minus review. Rather, Jewett was asked whether he ever told anybody that Yacko should be terminated from his employment at GM, to which he answered, "no." (Jewett Dep. at Tr. 9.) Jewett was then asked whether anyone ever asked him, to which he again answered, "no." (*Id.*) Once more, Jewett was asked, "did you ever tell anybody, 'Yacko ought to get a plus or a minus,'" to which he answered, "no." (Jewett Dep. at Tr. 64.) This testimony is consistent with the record because Jewett was *not* a part of the HRM/SubHRM teams that made the decision. (Dixon Dec. at ¶ 8.) Rather, it was the HRM/SubHRM teams who reached a consensus as to Yacko receiving a teamGM minus rating, after which Sipler *informed* Jewett of the rating and asked Jewett to *enter* the rating into the Workday system. (Sipler Dec. at ¶ 14; Dixon Dep. at 72; Gaeschke Dep. at Tr. 58.) Thus, Jewett's testimony that no one ever asked him whether Yacko deserved a minus is consistent with Sipler and Dixon's testimony that Jewett ultimately entered the rating into the system, because while he did enter the rating into Workday, he was *not* the decision-maker. As for Yacko's contention that Sipler's declaration is inconsistent with his deposition testimony, Sipler was *never* asked about what transpired at the HRM/SubHRM Meeting, nor was he asked who the decision-maker was as to Yacko's rating. (Sipler Dep. at Tr. 29.) Rather, Sipler was asked whether *he* personally gave Yacko the minus, to which he answered that Yacko was "given a minus review … by his supervisor," Jewett. (*Id.*) Sipler was then told that Jewett had testified that he did not do that, and asked if Jewett was lying, to which Sipler simply answered, "no." (*Id.*) Sipler was never asked to clarify, was never asked about the HRM/SubHRM Meeting, and was never asked who made the *decision* to rate Yacko a minus—rather than who ultimately "gave" Yacko the minus by way of updating a tag in the HR Workday system. (*Id.*) Therefore, the Court rejects Yacko's assertion that GM has been unable to "even give a straight answer" as to who recommended him for termination. *See infra* note 59. Accordingly, in light of the vastly consistent testimony and documentation on this point—being that the HRM/SubHRM teams reached a consensus to award Yacko the minus, following which Sipler asked Jewett to make the change in the computer system—the Court finds no genuine issue of material fact sufficient to survive summary judgment. (Sipler Dec. at ¶ 14; Dixon Dep. at 72; Gaeschke Dep. at Tr. 58.)

15

On January 31, 2023, CNN issued a news report following GM's 2022 fourth-quarter earnings ("January CNN Article").  (Doc. No. 27-2 at PageID #416–18.)  The January CNN Article reported that GM said it would reduce its staff in 2023 as part of its effort to cut $2 billion in costs over the next two years.[26]  (*Id.* at PageID #418.)  The January CNN Article noted that GM's reduction would be handled through attrition and not layoffs, and that GM would end the year "slightly lower" in headcount.  (*Id.*)  GM was focused on reducing costs in manufacturing overall, which included looking at people as part of cost.  (DeWildt Dep. at Tr. 79.)

In February 2023, GM implemented a performance separation plan to create a more performance driven culture.  (DeWildt Dec. at ¶ 2; DeWildt Dep. at Tr. 82.)  Specifically, Tammy DeWildt ("DeWildt"), an HR director at GM, was tasked with overseeing the performance separation plan in the manufacturing division by selecting for termination employees who received a teamGM minus annual performance rating in 2022.  (DeWildt Dec. at ¶ 2; DeWildt Dep. at Tr. 82.)  The plan involved terminating individuals who were not meeting performance expectations.  (DeWildt Dec. at ¶ 2; DeWildt Dep. at Tr. 41, 53, 82.)  After confirming the rating that they were not meeting expectations, the employees who received a teamGM minus rating would be terminated.  (DeWildt. Dep. at Tr. 82–91.)  DeWildt identified GM employees for termination, including Yacko, through a report that was run on GM's Workday system which identified any GM employees who had received a teamGM minus rating in 2022.[27]  (DeWildt Dep. at Tr. 84–90.)

---

[26] Although GM witnesses testified that they were unable to confirm that GM had provided this information to CNN, the same information appeared in GM's internal email circulated regarding the VSP.  (Doc. No. 27-6 at PageID #631.)

[27] DeWildt could not recall whether she clicked the button in Workday herself to run the report, or whether another member of her HR team clicked the button to run the report.  (DeWildt Dep. at Tr. 88.)

In February 2023, DeWildt led a video conference call with various GM HR-LR site directors, including Crystal Dixon ("Dixon"), the HR-LR site director for GM Parma, to discuss the performance separation plan procedures.[28] (Dixon Dec. at ¶ 12; Doc. No. 27-6 at PageID #582; Dixon Dep. at Tr. 61–62.) Jim Gaeschke, the GM Parma plant director, was also present on this call. (Gaeschke Dep. at Tr. 12, 15–16.) DeWildt explained during this presentation that GM decided to terminate underperforming managers[29] in manufacturing to further its goal of maintaining a high performing work culture, and that the company identified underperforming managers[30] as those who received teamGM minus ratings for 2022. (Dixon Dec. at ¶ 12; Doc. No. 27-6 at PageID #589–90; Dixon Dep. at Tr. 61–62.) Based on a review of all employees who received a teamGM minus rating in their 2022 annual review, 101[31] employees were identified for termination. (Doc. No. 27-7 at PageID #634.) This list included two employees from GM Parma—Yacko and Craig Conrad[32] ("Conrad"). (DeWildt Dep. at Tr. 132–33.)

---

[28] DeWildt's PowerPoint presentation included a "Performance Exits Timeline" with regards to manufacturing. (Doc. No. 27-6 at PageID #594.) That timeline indicates that HRLR Participants and Ops Leads were not notified as to the coming terminations until February 24, 2023, and February 27, 2023, respectively. (*Id.*) This timeline is consistent with the testimony surrounding the HRM/SubHRM Meeting in which various GM employees noted that termination was not discussed at that meeting, and that they were unaware that the minus-ratings would later be considered as grounds for termination. (Gaeschke Dep. at Tr. 45–46; Sipler Dep. at Tr. 29; Dixon Dec. at ¶¶ 9–10; DeWildt Dep. at Tr. 32, 35, 80.)

[29] The record reflects that the relevant GM witnesses did not consider age during any decision-making as to both Yacko's termination and his receiving of a teamGM minus rating. (DeWildt Dec. at ¶ 2; Sipler Dec. at ¶ 13; Gaeschke Dep. at Tr. 36; Dixon Dec. at ¶ 10; Yacko Dep. at Tr. 134.)

[30] In Workday, GM coded the termination of each of the employees as "involuntary job performance." (Dixon Dec. at ¶ 12.)

[31] DeWildt's declaration provides that 101 employees were terminated as part of the performance separation plan. (Doc. 27-7 at PageID #634.) However, GM's PowerPoint presentation indicates that 121 employees were identified for termination. (Doc. No. 27-6 at PageID #598.)

[32] Conrad was born in 1979. (Doc. No. 27-2 at PageID #381.) In addition to Conrad as a potential similarly-situated employee, Yacko asserts that Spells—another GM employee with the title Group Leader Maintenance—is also a similarly-situated employee to him. (Doc. 34-1 at PageID #1408–13.)

### G.     Yacko's Termination and Replacement by Roger East

To move forward with the terminations, DeWildt asked Dixon to confirm that the minus placement was appropriate for Yacko and Conrad, which she did.[33]  (DeWildt Dep. at Tr. 82–83, 90–91; 133–34; Dixon Dep. at Tr. 61–62.)  After Dixon confirmed the minus ratings, the next step of Yacko's termination was a meeting with Dixon and Gaeschke ("Termination Meeting").  (Doc. No. 27-6 at PageID #597, 603, 607; Yacko Dep. at Tr. 101–04; Doc. 27-2 at PageID #372; Gaeschke Dep. at Tr. 18–19.)

On February 28, 2023,[34] Yacko's Termination Meeting took place on a video call via Microsoft Teams.  (Doc. No. 27-6 at PageID #630; Yacko Dep. at Tr. 100–02; Gaeschke Dep. at Tr. 18.)  The Termination Meeting began with Gaeschke informing Yacko that he was being terminated for behavioral performance issues.  (Yacko Dep. at Tr. 102; Gaeschke Dep. at Tr. 18, 20.)  Yacko responded that he did not "have the slightest idea" what Gaeschke was talking about and that Gaeschke would have to explain it to him or clarify what behavioral performance issues meant.[35]

---

[33] Yacko suggests that DeWildt is not credible because she relied on Dixon to confirm that placement of teamGM minus ratings was warranted prior to effectuating terminations, after previously responding that she had not spoken with anyone about Yacko.  (Opposition at PageID #1319; DeWildt Dep. at Tr. 50.)  DeWildt responded to this in her deposition that she did not speak to anyone about the *specifics* of Yacko's case, but rather, simply made a generic request to plant leadership teams to confirm teamGM minus placements for employees prior to termination.  (DeWildt Dep. at Tr. 50–51.)  The general nature of DeWildt's request appears consistent with Dixon's testimony.  (Dixon Dep. at Tr. 61–62.)

[34] It should be noted that the parties' briefings are inconsistent as to the date that Yacko was terminated.  GM asserts that Yacko was terminated on February 28, 2023.  (Motion at PageID #263; Motion at PageID #263.)  During Yacko's deposition, Yacko initially testified that he was terminated on March 1, 2023, but later did not dispute the assertion that the termination occurred on February 28, 2023.  (Yacko Dep. at Tr. 99–100, 148.)  However, despite Yacko's concession during his deposition that he did not dispute the February termination date, in his Opposition he identifies his termination date as March 1, 2023.  (Opposition at PageID #1314, 1318.)  Upon independently reviewing the record, the Court determines that Yacko was terminated on February 28, 2023.  (Doc. 27-6 at PageID #630.)

[35] In his deposition, Gaeschke clarified that "behavioral performance issues" meant that Yacko did not meet GM expectations as a GM employee for the entire calendar year of 2022.  (Gaeschke Dep. at 20.)  Gaeschke was then asked whether he knew anything about Yacko's "behavioral performance issues," to which he explained that his knowledge came from the HRM/SubHRM Meeting he attended where Yacko's performance was discussed.  (Gaeschke Dep. at Tr. 22–25.)  Gaeschke indicated that Yacko's performance was reviewed during that meeting, and that complaints about

(Yacko Dep. at Tr. 102–03.) Gaeschke again repeated that Yacko was fired for behavioral performance, and then turned it over to Dixon who would give Yacko "all the information you need to know." (Yacko Dep. at Tr. 102–04.) Gaeschke then left the Termination Meeting call, and Dixon provided Yacko with information about formally exiting the company.[36] (Yacko Dep. at Tr. 103.) Prior to his termination, Yacko was making over $120,000.00/year[37] plus benefits and planned to retire in 2026 or 2027. (Yacko Dep. at 85.)

After the Termination Meeting, Gaeschke notified Sipler about Yacko's termination.[38] (Sipler Dec. at ¶ 15.) Although Yacko was terminated, his position was not eliminated. (Sipler Dec. at ¶ 17.) Instead, Sipler replaced Yacko by transferring Roger East ("East"),[39] a group leader in

---

Yacko's work performance and his performance issues in 2022 were discussed and shared with him. (*Id.*) When Gaeschke was asked whether he asked anyone at the HRM/SubHRM Meeting how they knew that their information was accurate, Gaeschke answered that he did not. (Gaeschke Dep. at Tr. 25.)

[36] Each employee terminated as part of the performance separation plan was offered a severance package in exchange for the execution of a separation agreement. (Dixon Dec. at ¶ 12.)

[37] The record is unclear as to Yacko's exact salary at the time he was terminated. In his deposition, Yacko did not dispute that his two-week pay rate as of February 28, 2023 was $4,934.25, pursuant to a purported pay stub from GM. (Yacko Dep. at Tr. 109.) Yacko was unable to verify his annual salary in his deposition. (Yacko Dep. at Tr. 107 ("No, I don't know. 120,000, without premium. Or with shift premium, 130,000, maybe. I'm not sure.").) During Dixon's deposition, Dixon was presented with a purported copy of Yacko's 2021 W-2 tax record denoting Yacko's salary at $149,148.84. (Dixon Dep. (Doc. No. 27-3) at Tr. 21–26.) Defendants' counsel objected to Dixon's ability to authenticate or speak to the tax record produced by Plaintiff's counsel. (Dixon Dep. at Tr. 22–24.) Instead, Defendants' counsel noted that GM had produced Yacko's tax records themselves and agreed to the authenticity as to those records. Similarly, during DeWildt's deposition, when presented with the same purported copy of Yacko's 2021 W-2 tax record, DeWildt testified that she was unable to validate the tax record and could not verify Yacko's salary. (DeWildt Dep. (Doc. No. 27-4) at Tr. 61–65, 72.) For purposes of this Opinion, given the lack of clarity surrounding Yacko's annual salary at the time he was terminated and the disputes regarding the authentication of the purported W2 tax record—which, notably, was from 2021 and would not indicate Yacko's salary at the time of his firing regardless—the Court shall refer to Yacko's salary as "over $120,000/year" without making a final factual determination as to Yacko's salary amount.

[38] In his declaration, Sipler avers that he did not know anything about Yacko's termination until after it had already occurred. (Sipler Dec. at ¶ 15.) Sipler further avers that Gaeschke never made any negative statements to him about Yacko, and that Sipler had never heard Gaeschke make negative comments about Yacko to anyone else. (Sipler Dec. at ¶ 16.)

[39] East was born in 1970. (Dixon Dec. at ¶ 20.) Yacko's assertions that East was a similarly-situated employee who was treated more favorably will be addressed below.

maintenance, from first shift into Yacko's former third-shift position.  (*Id.*)  Sipler later hired a new employee to backfill East's position on the first shift following other reorganization decisions.  (*Id.*)

### H.    VSP to Existing Employees and March CNN Article

On March 9, 2023, GM sent an email ("VSP Email") announcing that GM was offering a Voluntary Separation Program ("VSP") to salaried employees.  (Dixon Dep. at Tr. 20–21; DeWildt Dep. at Tr. 9–11; Gaeschke Dep. at Tr. 27; Doc. No. 27-6 at PageID #631.)  The VSP Email referenced GM's "plan to reduce $2 billion in structural costs over the next two years" and listed four major opportunities to do so, the fourth of which was "[r]educing salaried staff through attrition, primarily in the United States."  (Doc. No. 27-6 at PageID #631.)  The VSP provided certain salaried employees[40] the opportunity to leave GM with up to one-year of salary in exchange for executing a severance agreement.  (DeWildt Dep. at Tr. 71–72; Dixon Dec. at ¶ 19.)

To participate in the VSP, an employee had to apply for the program, and GM had to approve the employee's application.  (Dixon Dec. at ¶ 19; Dixon Dep. at Tr. 27–28.)  Employees had the choice not to apply to the VSP if they preferred to stay employed.  (Dixon Dep. at Tr. 30.)  Similarly, GM had discretion to deny approval for employees to participate in the VSP.  (Dixon Dep. at Tr. 27–28; Dixon Dec. at ¶ 19.)  At GM Parma, approximately 110 salaried employees were eligible to apply for the VSP.  (Dixon Dec. at ¶ 2; Doc. No. 27-6 at PageID #571–77.)  Fourteen GM Parma employees applied for the VSP, and thirteen were approved.  (*Id.*)  GM denied East's VSP application because it deemed him essential to the operation of GM Parma.  (Dixon Dec. at ¶ 20.)  Because Yacko was

---

[40] Managers with at least five years' service to GM were eligible to apply for the VSP.  (Dixon Dec. at ¶ 19; Doc. No. 27-6 at PageID #631.)  The VSP was not offered to any salaried employee who was not currently employed at GM.  (DeWildt Dep. at Tr. 71.)

terminated before the VSP was offered, he was not eligible to apply. (Yacko Dep. at Tr. 137; DeWildt Dep. at Tr. 71; Dixon Dec. at ¶ 19.)

On March 9, the same day as the VSP Email, CNN published an article about the VSP and GM's plans to reduce costs by $2 billion over the next two years. (Doc. No. 27-2 at PageID #419–21.)

## II.    Procedural History

On June 11, 2023, Yacko filed suit against GM and Gaeschke in the Court of Common Pleas of Cuyahoga County, Ohio. (Doc. No. 1-1.) In his Complaint, Yacko sets forth the following three Counts: (1) age discrimination in violation of Ohio Revised Code § 4112.02 against both GM and Gaeschke (Count One); (2) breach of employment contract against both GM and Gaeschke (Count Two); and (3) defamation by libel and slander against Gaeschke (Count Three). (*Id.* at ¶¶ 33–35.) On August 14, 2023, GM[41] removed Yacko's lawsuit to this Court. (Doc. No. 1.) On August 31, 2023, GM filed its Answer. (Doc. No. 5.)

On November 3, 2023, Gaeschke filed a Motion to Dismiss, seeking dismissal of Yacko's claims against him only. (Doc. No. 10.) On February 28, 2024, the Court issued a Memorandum Opinion and Order granting in part and denying in part Gaeschke's Motion to Dismiss. (Doc. No. 19.) Specifically, the Court granted Gaeschke's Motion to Dismiss as to Yacko's claims for age discrimination/aiding and abetting (Count One) and breach of contract (Count Two) but denied

---

[41] In its Notice of Removal, GM noted that Yacko had attempted to serve Gaeschke at its Parma Plant and contended that, because Gaeschke did not work in Ohio and did not have a physical presence in the state since before Yacko filed his Complaint, Yacko had "failed to properly serve Gaeschke." (Doc. No. 1 at PageID# 2 n.1; Doc. No. 1-4.) On September 5, 2023, the Court ordered Yacko to respond to this contention. (Non-Document Order, Sept. 5, 2023.) After Yacko filed a Response indicating that Gaeschke had authorized GM's counsel to accept service on his behalf, the Court ordered Yacko to re-attempt service upon Gaeschke via GM's counsel. (Doc. No. 6; Non-Document Order, Sept. 20, 2023.) Yacko completed service on Gaeschke on October 18, 2023. (Doc. No. 13.)

Gaeschke's Motion to Dismiss as to Yacko's claim for defamation (Count Three). (*Id.*) On March 8, 2024, Gaeschke filed his Answer. (Doc. No. 20.)

On July 17, 2024, following discovery, GM and Gaeschke filed a Motion for Summary Judgment ("Motion"), seeking judgment in their favor on all remaining counts. (Doc. No. 27.) On August 20, 2024, Yacko filed his Opposition to GM and Gaeschke's Motion for Summary Judgment ("Opposition"). (Doc. No. 33.) On September 17, 2024, GM and Gaeschke filed a Reply to Yacko's Opposition ("Reply"). (Doc. No. 37.)

Accordingly, GM and Gaeschke's Motion for Summary Judgment is ripe for a decision.

## III. Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." *Henderson v. Walled Lake Consol. Sch*., 469 F.3d 479, 487 (6th Cir. 2006). "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Cox v. Ky. Dep't of Transp*., 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is "material . . . only if its resolution might affect the outcome of the suit under the governing substantive law." *Henderson*, 469 F.3d at 487.

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 628 (6th Cir. 2018). In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact." *Ask Chems., LP v. Comput. Packages, Inc.*, 593 F. App'x 506,

508 (6th Cir. 2014).  The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 764 (6th Cir. 2008).  "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial, the moving party may [also] meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'"  *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial."  *Ask Chems.*, 593 F. App'x at 508–09.  "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'"  *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F. Supp. 3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

## IV.    Analysis

### A.    Age Discrimination (Count One)

In Count One, Yacko alleges that GM terminated him for a "false reason" in order to prevent him from "remaining employed until retirement" and "obtaining a retirement wage buy out while he is at retirement age."  (Compl. at ¶ 33.)  Yacko also alleges that, if he did commit a disciplinary offense, GM did not provide him with the progressive discipline that was offered to "other and younger managers so as to save his job," thereby constituting "age discrimination in violation of [Ohio Revised Code §] 4112.02 *et seq.*"  (*Id.*)

Ohio Revised Code section 4112.02, provides that it shall be an unlawful discriminatory practice "[f]or any employer, because of the . . . age . . . of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure,

23

terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."  Ohio Rev. Code § 4112.02(A).  Age discrimination claims brought under Ohio law "are 'analyzed under the same standards as federal claims brought under the [ADEA].'" *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012) (quoting *Wharton v. Gorman–Rupp Co*., 309 F. App'x 990, 995 (6th Cir. 2009)) (alteration in original).

  "An employee can establish an age discrimination case by either direct or circumstantial evidence."  *Martin v. Toledo Cardiology Consultants, Inc*., 548 F.3d 405, 410 (6th Cir. 2008).  Here, Yacko relies on circumstantial evidence of age discrimination.  (Opposition at PageID #1327, 1330.) Claims relying on indirect evidence of age discrimination are analyzed under the *McDonnell Douglas* burden-shifting framework.  *See Willard v. Huntington Ford, Inc*., 952 F.3d 795, 807 (6th Cir. 2020); *Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 536 (6th Cir. 2014).  Under that framework, the plaintiff must first produce "'evidence from which a reasonable jury could conclude that he or she established a *prima facie* case of discrimination' before the burden shifts to the employer to offer a legitimate, non-discriminatory reason for the adverse employment action."  *Willard*, 952 F.3d at 807 (quoting *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524 (6th Cir. 2007)).  The plaintiff must then rebut the proffered reason by producing "evidence from [] which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination."  *Id.* (quoting *Blair*, 505 F.3d at 524); *see also Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 812 (6th Cir. 2011) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  As the Sixth Circuit recently explained:

> As we have clarified before, the *McDonnell Douglas* burden-shifting framework allocates "the burden of production and [provides] an order for the presentation of proof in [employment discrimination] cases."  *Provenzano*, 663 F.3d at 812 (last alteration in original) (emphasis added) (citing *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 659 (6th Cir. 2000)). Thus, at the first stage of the burden-shifting framework, we do not ask whether a jury could conclude that the plaintiff has proven

its *prima facie* case by preponderant evidence, but rather whether "a reasonable jury could conclude that a *prima facie* case of discrimination has been established." *Provenzano,* 663 F.3d at 812 (quoting *Macy v. Hopkins Cty. Sch. Bd. of Educ.*, 484 F.3d 357, 364 (6th Cir. 2007)).  At the pretext stage, the plaintiff's burden of production "merges" with his ultimate burden of persuasion to show that age discrimination was the but-for cause of his termination. *Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

*Willard*, 952 F.3d at 807.

The Court will examine each stage, in turn, below.

### 1. *Prima Facie* **Case for Age Discrimination**

To establish a *prima facie* case of discrimination, a plaintiff must show that (1) he was a member of a protected class (older than 40 years old); (2) he suffered an adverse employment action; (3) he was qualified for the position held; and (4) he was replaced[42] by someone outside of the protected class or similarly situated non-protected employees were treated more favorably.  *See Pelcha v. MW Bancorp., Inc.,* 988 F.3d 318, 326 (6th Cir. 2021); *Geiger v. Tower Auto.*, 579 F.3d 614, 622–23 (6th Cir. 2009).  In age discrimination cases, the "fourth element is modified to require replacement not by a person outside the protected class, but merely replacement by a significantly younger person." *Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir. 2003) (citing *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 311–13 (1996)).

Establishing a *prima facie* case of age discrimination is a "light burden [that] is 'easily met' and 'not onerous.'"  *Pelcha*, 988 F.3d at 326 (quoting *Willard*, 952 F.3d at 808 (6th Cir. 2020)

---

[42] Yacko correctly notes that the Supreme Court of Ohio has found that the fourth factor may be satisfied if the plaintiff's "discharge permitted the retention of" a person not belonging to the protected class, as an alternative to the plaintiff being "replaced" by a person not belonging to the protected class.  (Opposition at PageID #1327) (citing *Coryell v. Bank One Trust Co. N.A.*, 101 Ohio St. 3d 175, 180 (2004)).  However, this clarification raises a moot point because GM has conceded that East replaced Yacko.  (*See* Motion at PageID #266) ("The record is undisputed that GM replaced Yacko with Roger East.").

(quoting *Provenzano*, 663 F.3d at 813)).  "[T]his light review must be distinguished from the more rigorous comparison conducted at the later stages" of the analysis.  *Provenzano*, 663 F.3d at 814.  "The sole function of the prima facie stage of the burden-shifting framework is to raise a rebuttable presumption of discrimination by eliminating the most common nondiscriminatory reasons for the employer's treatment of the plaintiff, such as the plaintiff is unqualified for the position or not a member of the protected group."  *Willard*, 952 F.3d at 808 (quoting *Cline*, 206 F.3d at 660) (internal quotation marks and alterations omitted).  It is "not meant to stymie plaintiffs, but simply serves to bring the litigants and the court expeditiously and fairly to the ultimate question."  *Cline*, 206 F.3d at 660 (internal quotation marks omitted); *see also Willard*, 952 F.3d at 808.

The first three elements of Yacko's *prima facie* case are satisfied.  Yacko was a member of the protected class because he was over the age of forty, and his termination constitutes an adverse employment action.  Moreover, GM's Motion does not dispute that Yacko was qualified for the position of Group Leader—Maintenance.[43]  Thus, the only issue is whether Yacko has satisfied the fourth element, i.e., that he was replaced by a significantly younger person or that similarly situated non-protected employees were treated more favorably.

### i.  Replaced by a Younger Employee

---

[43] GM does not appear to dispute that Yacko was qualified for his position from a technical-skills standpoint—which is supported by the record.  (*See, e.g.*, Doc. No. 27-2 at PageID #356; Jewett Dec. at ¶ 2; Sipler Dec. at ¶ 6.)  Instead, GM contends that Yacko received a teamGM minus rating, and that his teamGM minus rating was the basis for his later termination.  (Motion at PageID #267–69.)  However, GM does not argue in its Motion that Yacko's teamGM minus rating made him *unqualified* for his position—instead, GM frames Yacko's teamGM minus as its "legitimate, non-discriminatory reason for Yacko's termination."  (Motion at PageID #266–67.)  Accordingly, the Court will construe the third element of Yacko's *prima facie* case as uncontested by GM's Motion, and will instead analyze GM's assertions regarding Yacko's teamGM rating in relation to GM's burden to articulate a legitimate, non-discriminatory reason for Yacko's termination.

26

In its Motion, GM first submits that Yacko has failed to demonstrate that he was replaced by a significantly younger person.  (Motion at PageID #266.)  GM cites to *Grosjean* as establishing a bright-line rule that "in the absence of direct evidence that the employer considered age to be significant, an age difference of six years or less between an employee and a replacement is not significant" to satisfy a *prima facie* case.  (*Id.*)  GM then asserts that the record is undisputed that Yacko was replaced by East, who is a mere six years younger than him.  (*Id.*)  Thus, GM contends that Yacko cannot satisfy his *prima facie* burden because East is six years younger than him, and he has no evidence that any GM manager considered East to be significantly younger than him.  (*Id.*)

In his Opposition, Yacko contends that *Grosjean* only opined that an age difference of "six years *or less*" is not significant in the absence of additional direct evidence.  (Opposition at PageID #1328.)  Yacko thus asserts that the "six year and younger" test is inapplicable to this case because Yacko is six years *and eight months* older than East.  (*Id.* at PageID #1327.)  Yacko contends that the "substantially younger" determination must be evaluated on a case-by-case basis.  (*Id.* at PageID #1328.)  Yacko further contends that East's 2018 performance review referencing his ability to return to school for his bachelor's degree,[44] in comparison to Dixon's knowledge that Yacko was past his retirement age, could constitute direct evidence for a jury to find that GM considered their age difference to be significant.  (*Id.* at PageID #1328–29.)

In its Reply, GM asserts that Yacko's distinction regarding six years "and eight months" is inconsequential.  (Reply at PageID #1420.)  GM submits that Yacko does not cite any case law supporting the contention that six years is insignificantly younger, while six years and eight months

---

[44] At the end of East's 2018 Year-End Review, East's individual development plan notes: "Roger, you are still young enough and have the brain powrer, [sic] to go back to school and get your Electrical or a Computer Science, bachelor's degree."  (Doc. No. 33-3 at PageID #1364.)

is significantly younger. (*Id.*) Rather, GM contends that cases within this jurisdiction generally find an age difference of less than ten years insufficient to satisfy the *prima facie* burden and, when such a disparity is sufficient, it is only because some other evidence of age bias exists. (*Id.*) GM asserts that Yacko has no evidence of an age bias, and therefore, the slight difference between Yacko and East is insufficient to support Yacko's *prima facie* case for age discrimination. (*Id.*)

The Sixth Circuit has established that in the absence of direct evidence that the employer considered age to be significant, an age difference of six years or less between an employee and a replacement is not significant. *Grosjean*, 349 F.3d at 340. In *Grosjean*, the Sixth Circuit directly addressed the issue of what constitute a "significantly younger" replacement. *Id.* In looking to sister circuits, the court determined that age differences of ten or more years generally met the significantly younger requirement for age discrimination, while differences of less than ten years did not. *Id.* at 336–398. To not conflict with its prior precedent in which an eight-year difference was found to be significant, the court concluded that an age difference of six years or less, without direct evidence to the contrary, was not significant. *Id.* at 340.

The Sixth Circuit has clarified that *Grosjean* created a "zone of discretion in age-discrimination cases involving replacement by a person who is between six and ten years younger than the plaintiff." *Blizzard*, 698 F.3d at 284. Thus, age differences of "six to ten years … must be considered on a case-by-case basis." *Compare Blizzard*, 698 F.3d at 284 (finding six-and-a-half-year age difference sufficient to create material fact at summary judgment stage), *with Scola v. Publix Supermarkets, Inc.*, 557 F. App'x 458, 467 (6th Cir. 2014) (finding seven-year age difference insufficient to support *prima facie* case).

28

In *Scola*, the Sixth Circuit evaluated the district court's determination that a seven-year age difference did not constitute a "significantly younger" difference.  557 F. App'x at 467.  Aside from the seven-year age difference, the only evidence of discrimination consisted of comments made by another employee, who called the plaintiff an "old lady."  *Id.*  However, that comment was insufficient to support plaintiff's case because the employee who made the comment "was not a decisionmaker" with respect to the promotions at-issue, "nor w[as] his statement[] related to the decision-making process."  *Id.*  Therefore, the seven-year age difference, "without more, was not significant, and was not enough to give rise to an inference of discrimination in the eyes of a reasonable factfinder."  *Id.*

The Court finds Yacko's case to be analogous to *Scola* and concludes that the age difference between Yacko and East is not significant.  Although Yacko correctly points out that an age difference should be evaluated on a case-by-case basis rather than under *Grosjean*'s brightline six-year rule, Yacko fails to demonstrate the requisite facts required to show that GM considered Yacko and East's age difference to be significant.  (Opposition at PageID #1327–29.)  Numerous witnesses confirmed that age did not factor into the decision for East to replace Yacko's position.[45]  (Gaeschke Dep. at Tr. 35–36; Sipler Dep. at Tr. 48.)  Even Yacko, when asked during his deposition whether Jewett, Sipler, or Gaeschke had any bias against him because of his age, testified that he "can't say either way."[46]

---

[45] In his Opposition, Yacko asserts that Dixon initially testified that "she knew nothing" about Yacko and East's age, and then later submitted a declaration that included Yacko and East's ages.  (Opposition at PageID #1328.)  Upon reviewing the record, the Court finds this point to be irrelevant.  In her deposition, Dixon was not asked whether she "knew anything" about Yacko or East's age.  (Dixon Dep. at Tr. 20.)  Rather, Dixon was simply asked whether she knew what East's age was in 2023, and whether she knows what Yacko's age was in 2023.  (*Id.*)  The fact that Dixon was able to refer to company records at a later point, determine East and Yacko's ages, and include them in her declaration has no bearing on her ability to testify to those ages at a specific moment in time during her deposition.  (*Id.*)  To the contrary, Dixon's deposition testimony appears to suggest that at the time that decisions were being made in 2023, she was not aware of either East or Yacko's ages, which therefore could not have factored into any decision-making process.  (*Id.*)

[46] After being unable to confirm whether Jewett, Sipler, or Gaeschke harbored bias against him due to his age, Yacko was asked whether it was possible that he was terminated for reasons other than his age.  (Yacko Dep. at Tr. 132–33.)  Yacko

(Yacko Dep. at Tr. 134.)  Aside from the age difference, the only evidence Yacko offers to support that GM considered his age difference with East to be significant is East's 2018 year-end performance review referencing East's ability to return to school and obtain a bachelor's degree.  (Doc. No. 33-3 at PageID #1364.)  But this comment was made by Gilberto Crespo, who, just as in *Scola*, was neither the final decisionmaker for terminating Yacko or appointing East in his place, nor was his statement related to the decision-making process as it occurred in 2018.  (*Id.*; Dixon Dep. at Tr. 89–91.)

Therefore, because the age difference between Yacko and East was not significant, Yacko fails to satisfy the fourth element of his *prima facie* case by showing that he was replaced by a significantly younger employee.

### ii.  Similarly Situated Younger Employee

In his Opposition,[47] Yacko asserts, as a second attempt to satisfy the fourth element of his *prima facie* case, that similarly situated non-protected employees were treated more favorably than him.  (Opposition at PageID #1329–30.)  First, Yacko contends that East was treated more favorably than him because he also had a "bad record" but was not terminated.  (Opposition at PageID #1329.)  Second, Yacko asserts that Conrad was treated more favorably than him, even though he was terminated alongside Yacko, because Conrad was permitted to participate in a performance improvement plan ("PIP") in 2019 when facing poor performance discipline.  (*Id.*)  Finally, Yacko contends that Brian Spells ("Spells")—another GM employee with the title Group Leader

---

responded that the reason for his firing was "totally nonsensical."  (Yacko Dep. at Tr. 133.)  Yacko was asked again whether he received the minus rating specifically *because* of his age, to which Yacko responded, "I don't know if it came into their mind or not."  (*Id.*)

[47] In its initial Motion, GM did not address the issue of whether a similarly situated non-protected employee was treated more favorably than Yacko.  Rather, this argument was raised by Yacko in his Opposition.  (Opposition at PageID #1329–30.)  GM responds to this argument in its Reply.  (Reply at PageID #1420.)

Maintenance—was treated more favorably than him by being given a par rating even while showing signs of ignoring Jewett and not learning his job.  (*Id.*)

In its Reply, GM denies that Conrad was treated more favorably than Yacko.[48]  (Reply at PageID #1420.)  First, GM asserts that there is no evidence that Conrad was placed on a PIP.[49]  (*Id.*)  Second, GM asserts that even if Conrad was placed on a PIP, the record fails to establish that he was similarly situated to Yacko because there is no evidence that Conrad or Yacko reported to the same managers, had the same performance deficiencies, and the alleged PIP took place three years earlier.  (*Id.*)  GM does not address Yacko's contentions that East and Spells were similarly situated and treated more favorably than him because they did not receive teamGM minus ratings on similar behavior.[50]  (Reply at PageID #1424.)

To analyze whether two individuals are similarly situated, "the question is whether the plaintiff has 'demonstrate[d] that he or she is similarly-situated to the non-protected employee in all *relevant* respects.'"  *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 522 (6th Cir. 2008) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998)).  "Relevant factors used to compare a complainant's treatment to another individual include '[dealing] with the same

---

[48] In its Reply, GM refers to Conrad as "Employee B."  (Reply at PageID #1420.)  The Court shall refer to Conrad by his name for consistency and to avoid confusion.

[49] GM admits that Conrad's 2019 mid-year evaluation states that his manager "was going to place him on a PIP."  (Reply at PageID #1420; Doc. No. 33-2 at PageID #1349.)  However, GM contends that there is no testimony from witnesses with personal knowledge or documents to establish that Conrad was *actually* placed on a PIP, or what the content and outcome of that PIP was.  (*Id.*)  The Court rejects this argument.  At a minimum, the admission that Conrad's 2019 mid-year evaluation references placing him on a PIP compared with DeWildt's inability to confirm whether Conrad was actually placed on a PIP creates a genuine issue of material fact on this point.  (*Compare* DeWildt Dep. at Tr. 133, *with* Reply at PageID #1420.)  For purposes of this Opinion, the Court shall presume that Conrad was placed on a PIP.

[50] GM briefly notes that whether Spells deserved a teamGM minus rating does not show pretext because the "possibility that a jury might disagree with the wisdom of the company's decision does not show pretext."  (Reply at PageID #1424.)  However, GM asserts this within the context of disproving pretext rather than to dispute any *prima facie* case.  (*Id.*)  The Court shall therefore address these arguments in its later discussion of pretext.

31

supervisor, [being] subject to the same standards and . . . [engaging] in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Townes v. Oprisch*, No. 5:08-CV-1218, 2009 WL 10723009, at *4 (N.D. Ohio July 31, 2009) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582-583 (6th Cir. 1992)).

The Court finds that Yacko's assertions satisfy his burden at this early *prima facie* stage.[51] Yacko's contentions that East, Conrad, and Spells were treated differently than him despite their various disciplinary issues is sufficient to meet the "light burden" required to establish a *prima facie* case of age discrimination. *Pelcha*, 988 F.3d at 326. While these assertions must be scrutinized under a "more rigorous comparison … at the later stages" of the analysis, they are sufficient at this stage. *Provenzano*, 663 F.3d at 814.

Accordingly, the Court concludes that Yacko has established the fourth prong of his *prima facie* case of age discrimination.

### 2. Legitimate Non-Discriminatory Reason for Termination

Because Yacko has established a *prima facie* case of age discrimination, the burden shifts to GM to articulate a legitimate, non-discriminatory reason for Yacko's termination. *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1464 (6th Cir. 1990) (citing *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981)); *Fabiniak v. Wal-Mart Stores East, LP*, 2023 WL 2592358, at *3 (6th Cir. Mar. 22, 2023). "Poor performance is a legitimate, non-discriminatory reason for terminating a worker's employment." *Rosado v. Tremco Incorporated*, 2021 WL 4736982, at *5 (N.D. Ohio May 26, 2021); *see also Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1116 (6th Cir. 2001).

---

[51] The Court bears in mind the low burden for satisfying the *prima facie* stage of age discrimination, as compared to Yacko's later burden of demonstrating that GM's legitimate non-discriminatory reason for the adverse employment decision is pretextual. *See Pelcha*, 952 F.3d at 808; *Provenzano*, 663 F.3d at 814.

The Court finds that GM has sufficiently articulated a legitimate, non-discriminatory reason for Yacko's termination.  GM asserts that it terminated every manager in its manufacturing division who received a teamGM minus performance rating, including Yacko, to promote its goal of maintaining a high-performance culture.  (Motion at PageID #267; Dixon Dep. at Tr. 29, 62, 78, 95; DeWildt Dep. at Tr. 30, 32, 41, 60–61, 80–84; Gaeschke Dep. at Tr. 23, 30, 49.)  As to Yacko receiving the teamGM minus rating, GM contends that Yacko displayed numerous examples of behavioral performance issues involving attendance, interactions with co-workers, and his reactions to being addressed by GM leadership, that culminated into his final teamGM minus rating after being discussed at the HRM/SubHRM Meeting.  (Doc. No. 27–2 at PageID #356; Dixon Dep. at Tr. 65–72; Dixon Dec. at ¶¶ 8–10; Jewett Dep. at Tr. 23–24, 32, 38–41, 45; Jewett Dec. at ¶¶ 2–6; Sipler Dep. at Tr. 16–17, 34; Sipler Dec. at ¶¶ 6–13; Gaeschke Dep. at 49.)

Accordingly, GM has satisfied its burden to articulate a legitimate, non-discriminatory reason for Yacko's termination.

### 3.  Rebutting Proffered Reason as Pretext

"When an employer offers nondiscriminatory reasons for an adverse employment action, the burden shifts back to the employee to prove that the stated reason for [his] termination is pretextual." *Blizzard*, 698 F.3d at 285.  Yacko contends that GM's reasons were pretext for unlawful age discrimination.  (Opposition at PageID #1330–32.)  At this stage, Yacko "has the burden to produce 'sufficient evidence from which a jury could reasonably reject [the employer's] explanation of why it fired [him].'"  *Blizzard*, 698 F.3d at 285 (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)) (first alteration in original).  Yacko "can accomplish this by proving '(1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate [his discharge],

or (3) that they were *insufficient* to motivate discharge.'" *Id.* (quoting *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012)) (emphasis and alteration in original).  This "three-part test need not be applied rigidly." *Id.*  As the Sixth Circuit has explained:

> Pretext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?  This requires a court to ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so, how strong it is.  One can distill the inquiry into a number of component parts, and it can be useful to do so.  But that should not cause one to lose sight of the fact that at bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ("[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason."); *Forrester,* 453 F.3d at 417 ("If [the proffered reason] is not the true ground, the employer may still be innocent of discrimination; he may for example have lied to conceal a reason that was discreditable but not discriminatory.") (citations omitted).  At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation.  If so, her prima facie case is sufficient to support an inference of discrimination at trial. *Hicks,* 509 U.S. at 511, 113 S. Ct. 2742.  But summary judgment is proper if, based on the evidence presented, a jury could not reasonably doubt the employer's explanation. *See Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148, 120 S. Ct. 2097, 147 L.Ed.2d 105 (2000) ("[A]n employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.").

*Chen*, 580 F.3d at 400, n.4; *see also Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012).

"At the pretext stage, the plaintiff's burden of production 'merges' with his ultimate burden of persuasion to show that age discrimination was the but-for cause of his termination." *Willard*, 952 F.3d at 807. *See also Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 177 (2009).  Meeting this causation requirement "is no simple task." *Pelcha*, 988 F.3d at 323.  It requires a plaintiff to show, by a preponderance of the evidence, that "age was the determinative reason they were terminated;

34

that is, they must show 'that age was the 'reason' that the employer decided to act.'" *Id.* at 323-324 (quoting *Scheick v. Tecumseh Pub. Schs.*, 766 F.3d 523, 529 (6th Cir. 2014)).  Stated differently, a plaintiff must show that "age '*had a determinative influence on the outcome*' of the employer's decision-making process." *Pelcha,* 988 F.3d at 324 (quoting *Gross*, 557 U.S. at 176) (emphasis in original).  *See also Sloat v. Hewlett-Packard*, 18 F.4th 204, 209 (6th Cir. 2021).

In its Motion, GM contends that Yacko has no evidence to show that the reasons for his termination were pretextual.  (Motion at PageID #267.)  GM submits that there is no evidence to dispute that Yacko received a teamGM minus rating for his 2022 performance, and that he was terminated like every other manager who received the same rating.  (Motion at PageID #267–68.)  GM asserts that aside from being in the protected age group, Yacko has no evidence that his age played a part in his termination.  (Motion at PageID #268.)  GM further contends that Yacko's disagreement as to his minus rating is insufficient to prove pretext.  (*Id.*)  Finally, GM asserts that Yacko has no evidence for a jury to conclude that he was selected for termination because of his age considering that more than thirty GM Parma managers were older than him.  (Motion at PageID #269.)

In his Opposition, Yacko sets forth numerous arguments challenging the basis for Yacko's teamGM minus rating.  (Opposition at PageID #1325.)  Specifically, Yacko contends that the lack of consistency and clarity from GM's leadership as to the process for Yacko receiving the minus rating, including who assigned Yacko the minus, shows that the minus rating was a pretextual reason for Yacko's termination.  (Opposition at PageID #1325–27, 1332.)  Yacko also asserts that each of the examples of performance issues cited by GM were not identified by any deponent as actual grounds for Yacko's termination or minus rating, and that many of the incidents are contradicted.  (Opposition

at PageID #1325–26.)  Yacko further highlights that Jewett noted during his deposition that he did not agree with Yacko's termination, which supports the conclusion that it was not justified. (Opposition at PageID #1326.)  Next, Yacko asserts that it means nothing that over thirty managers at GM Parma are older than him because that does not assess individual local circumstances. (Opposition at PageID #1324, 1332.)  Finally, Yacko points to the difference in treatment between himself as compared to East, Conrad, and Spells.  (Opposition at PageID #1328–30.)

In its Reply, GM reiterates that there exists no evidence to show that any member of GM leadership considered age in the decisions to terminate Yacko or replace him.  (Reply at PageID #1421.)  Specifically, GM contends that no reasonable jury could find that but-for Yacko's age, he would not have been selected for termination.  (Reply at PageID #1422.)  GM further asserts that Yacko's theory fails because it is undisputed that the HRM/SubHRM teams who issued the 2022 performance ratings did not know that giving Yacko a teamGM minus rating would result in his termination.  (*Id.*)  Finally, GM contends that Yacko's disagreement with GM's business judgment in awarding him a teamGM minus decision cannot show pretext.  (Reply at PageID #1424.)

As a preliminary matter, the Court, upon reviewing the record in-full, determines that Yacko has failed to demonstrate a genuine issue of material fact regarding the reason for Yacko's termination.  The testimony is consistent that Yacko was terminated because of his teamGM minus rating which represented his poor performance in 2022, no differently than all other managers who received a teamGM minus rating.  (Dixon Dep. at Tr. 29, 62; DeWildt Dep. at Tr. 32–33, 35, 41, 84–85; Gaeschke Dep. at Tr. 23, 30.)  The record is clear that DeWildt was the final decisionmaker as to Yacko's termination.  (DeWildt Dep. at Tr. 29; Dixon Dec. at ¶ 12; Gaeschke Dep. at Tr. 15–16.)  Further, DeWildt was not present at the HRM/SubHRM Meeting where Yacko received his minus

rating.[52]  (DeWildt Dep. at Tr. 32.)  Importantly, the testimony is consistent that the attendees of the HRM/SubHRM Meeting did not discuss termination at that meeting and did not know that the results of their annual reviews, specifically, the teamGM minus ratings, would later serve as grounds for performance-related terminations.  (Gaeschke Dep. at Tr. 45–46; Sipler Dep. at Tr. 29; Dixon Dec. at ¶¶ 9–10; DeWildt Dep. at Tr. 32, 35, 80.)  Thus, the decision to award Yacko a minus rating was entirely separate from the decision to terminate him, undermining any assertion that the former was merely a pretextual step in effectuating the latter.

Moreover, the Court determines that Yacko has failed to demonstrate a genuine issue of material fact regarding the basis for Yacko's teamGM minus rating.  Yacko's various incidents in the first half of 2022 are well documented, which include not merely the initial incidents themselves, but also Yacko's adverse reactions to those incidents when GM's management raised them with Yacko. *See supra* **Sections 1.B, 1.C**.  Then, in October 2022, Sipler took various steps to review Yacko's performance in preparation for the HRM/SubHRM Meeting.  First, Sipler met with Jewett to discuss Yacko's performance.  (Doc. 27-9 at PageID #657–59; Sipler Dec. at ¶ 11.)  Following that discussion, Sipler prepared a teamGM minus form[53] as documentation for use during the HRM/SubHRM Meeting and sent that form to Jewett for him to add to it as appropriate.  (Doc. No. 27-9 at PageID #660–63; Sipler Dec. at ¶ 12.)  Jewett, as Yacko's direct supervisor, did not have anything to add to the form.  (Jewett Dep. at Tr. 64.)  Sipler then attended the HRM/SubHRM

---

[52] The only GM leadership member who both attended the HRM/SubHRM Meeting and was involved in Yacko's termination was Gaeschke.  However, Gaeschke had no say in the decision to terminate Yacko—rather, he was simply instructed by DeWildt, the final decisionmaker, to carry out the termination.  (Gaeschke Dep. at Tr. 15–16, 24; DeWildt Dep. at Tr. 49; DeWildt Dec. at ¶ 2.)

[53] *See supra* note 20.

Meeting, engaged in a discussion with the other attendees, and collectively reached a consensus[54] regarding Yacko's teamGM minus rating.  (Sipler Dec. at ¶ 13.)  Thereafter, Sipler met again with Jewett to discuss the teamGM minus rating, and instructed Jewett to enter the rating into Workday.[55] (Sipler Dec. at ¶ 14.)

Yacko points to Sipler's testimony that Yacko's various behavioral incidents were not used as the "grounds to terminate his employment," and that Sipler did not know the grounds for Yacko's termination, as evidence that Yacko's termination was unsupported.  (Opposition at PageID #1322.) However, this testimony only bolsters the previous testimony that Yacko's termination was *never* discussed at the HRM/SubHRM Meeting.  Yacko was terminated because of his teamGM minus rating, *not* because of any single incident that Sipler was questioned about.  (Dixon Dep. at Tr. 29, 62; DeWildt Dep. at Tr. 32–33, 35, 41, 84–85; Gaeschke Dep. at Tr. 23, 30.)

The Court finds Yacko's case to be factually similar to *Pavicic v. Quaker Oats Co.*, 1997 WL 34735580 (E.D. Mich. Dec. 15, 1997).  In *Pavicic*, the plaintiff was terminated as a part of a company-wide reduction in force program intended to put the company in a better competitive position.  *Id.* at *1.  Prior to the plaintiff's termination, the company had implemented a performance rating system in which employees were given an overall rating of A, B, or C.  *Id.* at *3.  The company ultimately terminated every C rated salesperson in the country, regardless of age, sex, or race.  *Id.*  The court rejected plaintiff's claims of discrimination, determining that "plaintiff lost his job because he received a C rating … Without exception, every salesperson who received a C rating was let go." *Id.*

---

[54] *See supra* note 24.

[55] *See supra* note 25.

at *5.  Here, in similar fashion, every employee who received a teamGM minus rating was terminated, without exception.  (Dixon Dep. at Tr. 29, 62; DeWildt Dep. at Tr. 32–33, 35, 41, 84–85; Gaeschke Dep. at Tr. 23, 30.)

The Sixth Circuit has expressly rejected the notion that terminating employees based on subjective rating criteria permits an automatic inference of discrimination.  *See Beck v. Buckeye Pipeline Services Co.*, 501 F. App'x 447, 450 (6th Cir. 2012); *Browning v. Dep't of Army*, 436 F.3d 692, 697 (6th Cir. 2006).  Rather, it is the "employer's motivation, not the applicant's perceptions, … that is key to the discrimination inquiry." *Browning*, 436 F.3d at 697.  Yacko's termination based on his teamGM minus rating can only support a finding of discrimination if the teamGM minus rating was "used to disguise discriminatory action." *Beck*, 501 F. App'x at 450.  In other words, Yacko can only succeed by proving that GM's reasons for terminating him had *no basis in fact*, did not *actually* motivate his discharge, or were *insufficient* to motivate discharge. *Blizzard*, 698 F.3d at 285.

Yacko's voluminous references to testimony from Gaeschke, Dixon, DeWildt, Jewett, and Sipler fail to satisfy this burden.

Yacko first takes issue with Gaeschke's testimony.  Yacko cites to Gaeschke's deposition testimony that he "never criticized Yacko's performance" as an attempt to show that Gaeschke had no basis for firing Yacko.  (Opposition at PageID #1315; Gaeschke Dep. at Tr. 22.)  Yet, immediately afterwards, when Gaeschke was asked whether that meant he "[knew] nothing about [Yacko's] behavioral performance issues," Gaeschke instantly replied, "No, that is not true.  It was shared with me that he had performance issues in 2022 … His performance was reviewed in our HRM meeting." (Gaeschke Dep. at Tr. 23.)  Next, Yacko asserts that Gaeschke did "not know what person gave the order" to fire Yacko.  (Opposition at PageID #1315; Gaeschke Dep. at Tr. 15.)  However, Gaeschke

testified that he received the direction to terminate Yacko from "Headquarters, HR team," as he was given the direction to terminate 2022 low performers on a conference call that he was instructed to attend by DeWildt—which is consistent with the DeWildt's testimony.  (Gaeschke Dep. at Tr. 15–16; DeWildt Dep. at Tr. 39.)  Yacko further asserts that when Gaeschke was asked whether he "had any evidence that the excuse offered by GM for firing Yacko is accurate," Gaeschke answered, "I don't know how to answer that question."  (Gaeschke Dep. at Tr. 25–26.)  Yet Gaeschke had just testified that Yacko's behavioral performance issues had been shared with him at the HRM meeting. (Gaeschke Dep. at Tr. 23.)  The mere fact that Gaeschke did not explicitly ask Yacko's superiors— many of whom had interacted with Yacko directly—how they knew their information about Yacko was accurate does not create any genuine issue of fact.  (Gaeschke Dep. at Tr. 25.)  Finally, Yacko's reference to Gaeschke's testimony that he terminated Yacko over his "most recent performance review" but had not read the review himself is without context.  (Opposition at PageID #1315; Gaeschke Dep. at Tr. 20–21.)  While Gaeschke did not read the physical review himself, he had knowledge of the same details regarding Yacko's 2022 performance that were contained in the review because those details were shared with him during the HRM/SubHRM Meeting.  (Opposition at PageID #1316; Gaeschke Dep. at Tr. 23, 25.)

Yacko then unsuccessfully challenges Dixon's testimony.  Yacko asserts that Dixon, in her deposition testimony, admitted that Yacko was fired for "poor performance" despite being qualified for employment.  (Opposition at PageID #1316–17.)  A review of the record reveals that Dixon was asked whether Yacko was "over 40, … qualified, and he was fired."  (Dixon Dep. at Tr. 18.)  In response, Dixon specifically answered that "if you mean by qualifications, his experience, he was qualified, yes, he was over 40 and his employment was terminated due to poor performance."  (Dixon

Dep. at Tr. 19.) Dixon's testimony thus reflects that Yacko was qualified in the sense that he had relevant past experience, and not that he was qualified to keep his position notwithstanding his recent poor performance. Next, Yacko asserts that Dixon agreed that the alleged attendance issue was not grounds for termination. (Opposition at PageID #1317.) Yacko's assertion mischaracterizes the record. In her deposition, Dixon was asked a hypothetical question: "If my client had only called off or late or anything like that, one time, would that be grounds for termination of his employment." (Dixon Dep. at Tr. 40.) Dixon responded, "I can't answer that hypothetical. But to a reasonable person, I would say no." (*Id.*) Dixon thus never agreed that Yacko's alleged attendance issues— which included *multiple* call-off dates that were documented and later addressed in a meeting with Jewett and Sipler—were not grounds for termination. (Doc. No. 27-2 at PageID #361.) Yacko further asserts that Dixon was asked to identify communication problems with Jewett and could not provide specific examples. (Opposition at PageID #1317.) Yacko's assertion again mischaracterizes the record. Dixon was asked about the problems that *Sipler* identified Yacko as having, to which she responded that Yacko had communication problems with his direct leader. (Dixon Dep. at Tr. 41– 42.) When asked for a specific event involving Jewett, Dixon responded that Sipler himself did not give her specifics, but that examples were documented in Yacko's performance evaluation. (*Id.*) Then, when asked again about what examples Sipler gave, Dixon again responded that although Sipler did not give specific examples, *Jewett did provide her examples* such as not keeping him updated with respect to maintenance issues. (*Id.*) Finally, Yacko asserts that Dixon did not meet with Jewett to discuss Yacko's 2022 review until a week prior to her deposition. (Opposition at PageID #1317– 18.) However, Yacko's 2022 performance was discussed at the HRM/SubHRM Meeting by Sipler, who had met with Jewett in-advance to discuss Yacko's performance in preparation for the meeting.

41

(Doc. No. 27-9 at PageID #657.)  Notably, Dixon expressly acknowledges that as Jewett's supervisor, Sipler may have conversed with Jewett regarding Yacko's performance.  (Dixon Dep. at Tr. 48.)

Yacko then moves on to DeWildt's testimony.  Yacko first asserts that DeWildt indicated that she made the final decision to terminate Yacko but was not the original decisionmaker on the issue.  (Opposition at PageID #1319.)  In her deposition, DeWildt clarified that she made the decision to terminate Yacko based on his rating of minus, but that she was not involved in assigning Yacko the minus as that decision came from the HRM committee at GM Parma.  (DeWildt Dep. at Tr. 32.)  Next, Yacko asserts that DeWildt testified that she "did not know Yacko existed as a 'human being' until February 2023."  (Opposition at PageID #1319.)  Yacko's assertion mischaracterizes the record.  In her deposition, DeWildt was asked, multiple times in a row, when it came to her attention that Yacko was not meeting expectations.  (DeWildt Dep. at Tr. 82–83.)  Not satisfied with her responses, counsel asked DeWildt again: "The question is, when did it come to your attention, that Yacko, as a human being existed, *that ought to be terminated*."  (DeWildt Dep. at Tr. 83) (emphasis added).  DeWildt responded, "February 2023."  (*Id.*)  Looking at the context of the deposition testimony, DeWildt's response is clearly responding to counsel's question as to when it came to her attention that Yacko "ought to be terminated," not when she learned he existed.  (*Id.*)  Yacko further asserts that DeWildt could not explain what questions are asked by managers to calibrate what rating an employee receives.  (Opposition at PageID #1320.)  Yacko's assertion again mischaracterizes the record.  In her deposition, DeWildt was asked whether there were questions that employees must answer to determine their plus, minus, or par rating.  (DeWildt Dep. at Tr. 105–106.)  DeWildt responded that there were *not* specific questions, but that it was all part of the calibration discussions, which she then explained involved discussions with managers regarding an employee's performance to goals,

relativity, performance to peers, and any specific circumstances to that employee. (*Id.*) Finally, Yacko asserts that DeWildt admitted there was "not one place where the review indicated that the Plaintiff 'did not meet' expectations." (Opposition at PAgeID #1321.) Yet, DeWildt explicitly testified that Exhibit 1-25 "has multiple examples where he did not meet expectations within 2022 year in the manager evaluation section," referencing comments about Yacko's attitude, difficulty accepting criticism and dealing with upper management, and approachability. (DeWildt Dep. at Tr. 124.)

Finally, Yacko turns to Sipler's testimony. Yacko first points to Sipler's testimony that he never talked to anybody about whether Yacko should be terminated from his GM employment. (Opposition at PageID #1321; Sipler Dep. at Tr. 10–11.) This testimony is consistent with all other witnesses who testified that termination was never discussed at the HRM/SubHRM Meeting and that they were unaware that the teamGM minus rating would later serve as grounds for terminating employees. (Sipler Dep. at Tr. 10–11.) Further, this statement is consistent with Sipler's later testimony, in which he testified that he did not learn of Yacko's termination until after it had happened. (Sipler Dep. at Tr. 61.) Next, Yacko asserts that Sipler's declaration regarding a thoughtful discussion as to Yacko's performance is contradicted by Dixon's testimony regarding the length of time that each employee was discussed. (Opposition at PageID #1322; Sipler Dec. at ¶ 10–13.) As explained above,[56] this Court rejects the assertion that Yacko was only discussed for one minute at the HRM/SubHRM Meeting. Finally, Yacko asserts that Sipler had no evidence that Yacko ever withheld information from Jewett. (Opposition at PageID #1322.) Yacko's assertion

---

[56] *See supra* note 22.

mischaracterizes the record.  Sipler testified in his deposition that Jewett had reported to him, multiple times over several months, that Yacko would not keep him informed when there were breakdowns occurring in the plant.  (Sipler Dep. at Tr. 38.)  The fact that Sipler could not break down the specifics of any one instance due to not having been on third shift himself does not mean that Sipler had "no evidence"—Sipler was permitted to rely upon the representations made to him by Yacko's direct supervisor.  (Sipler Dep. at Tr. 38–39.)

Ultimately, Yacko's disagreement as to the justification of his teamGM minus designation does not salvage his claim.[57]  *See Meyrose v. Vitas Hospice Services, LLC*, 2022 WL 3046969, at *2 (6th Cir. Aug. 2, 2022) ("Mainly, he repeatedly notes that he disputed the evaluations in writing when he received them.  But his beliefs about his performance do not create a genuine issue of material fact either, no matter how strong."); *Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72, 81 (6th Cir. 2020) ("But disagreeing with an employer's assessment of performance does not render the employer's reasons pretextual.") (internal quotation marks omitted).  Although Yacko asserts that courts should not "blindly accept the employer's proffered reason for adverse action taken" as honest,[58] the Court

---

[57] Yacko also contends that Jewett testified that he personally did not agree with a minus.  (Jewett Dep. at Tr. 64.)  But, as previously discussed, Jewett was not a decision-maker in Yacko's case.  Moreover, the record evidence as to Yacko's various incidents does not support a finding that the HRM/SubHRM Meeting attendees' consensus to award Yacko a teamGM minus designation had *no basis in fact*, did not *actually* motivate his discharge, or were *insufficient* to motivate discharge.  *Blizzard*, 698 F.3d at 285.

[58] Citing *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996), Yacko asserts that Sipler and Dixon blamed the minus rating on Jewett, who disagreed with the minus, which thus constitutes a "change" in rationale for making an adverse employment decision that can be evidence of pretext.  Opposition at PageID #1331.  First, Jewett was never a decision-maker in Yacko's case.  Second, the record reflects that Yacko received his minus from the HRM/SubHRM Meeting, and that Jewett simply input the minus into the Workday system after the decision had already been made.  *See supra* note 25.

finds that the decision[59] to award Yacko a teamGM minus rating is adequately supported by the record such as to survive a pretextual challenge.[60] (Opposition at PageID #1332).

    Further, Yacko's assertion that East, Conrad, and Spells were treated differently fails to show pretext. Neither East, Conrad, nor Spells received a teamGM minus rating that warranted their termination. Even if they had received teamGM minus ratings, that would not have prevented Yacko from being terminated. *See Pavicic*, 1997 WL 34735580, at *5 ("Even if the three who replaced plaintiff had been ranked lower than him, plaintiff still would have been terminated. Without exception, every salesperson who received a C rating was let go."). As to Yacko's point that East, Conrad, and Spells were similarly situated employees who were treated differently, the Court finds that Yacko's performance was distinguishable.[61]

---

[59] Citing *Coburn v. Rockwell Automation, Inc.*, 238 F. App'x 112, 122 (6th Cir. 2007), Yacko asserts that GM witnesses failed to name the actual decisionmaker regarding the decision to terminate Yacko, and that their failure to do so casts a "shadow of doubt" over GM's explanation for terminating Yacko. (Opposition at PageID #1331) ("[A] reasonable jury could infer that if employer cannot even give a straight answer about who recommended plaintiff for termination it is trying to hide something.") (alterations omitted). However, there is no dispute that the actual final decisionmaker to *terminate* Yacko was DeWildt. (DeWildt Dep. at Tr. 45; Dixon Dep. at Tr. 61–62; Gaeschke Dep. at Tr. 15–16.) Rather, Yacko's assertion regarding GM's "failure to name the actual decisionmaker" refers to the decision to award Yacko a teamGM minus rating, not the decision to terminate him. Because the decisionmaker as to Yacko's termination is not disputed, *Coburn* is inapplicable. Further, the Court finds that the record sufficiently supports the conclusion that Yacko received the teamGM minus rating from a consensus of the HRM/SubHRM teams, following discussion led by Sipler. And the record is consistent that the HRM/SubHRM team members were not aware that Yacko would be terminated at the time that Yacko received his teamGM minus rating.

[60] Yacko references the CNN articles as proof that GM was "seeking to eliminate employees in a reduction-in-force through attrition meant to save the company $2 billion." (Opposition at PageID #1315.) However, while perhaps relevant to establishing Yacko's *prima facie* case, the fact that GM was seeking to save costs within its company is irrelevant if GM is able to articulate a legitimate non-discriminatory reason for Yacko's termination, and Yacko is unable to show that the reason is pretextual. Accordingly, Yacko bears the burden of showing that but-for his *age*, he would not have been terminated. *Pelcha*, 988 F.3d at 323–24. Yacko has failed to make this showing.

[61] When discussing Yacko's attendance issues, Sipler testified that it was not merely the attendance issues themselves that were problematic—rather, it was Yacko's "behavior during the meeting where we were discussing his absences, in an informal meeting, to help him understand that he was not behaving in a proper manner" with which Sipler and Jewett had issues. (Sipler Dep. at Tr. 36; Jewett Dep. at Tr. 23, 32.) Setting aside the lack of context surrounding the evidence regarding East, Conrad, or Spells' performance issues, if any, there is no evidence that any of them exhibited these sorts of disrespectful behaviors towards GM management *after being informed* that they had erred in some respect to the same degree or on as many occasions as Yacko. (Doc. No. 33-3 at PageID #1357–64; Doc. No. 33-4 at PageID #1365–73;

Simply put, Yacko is unable to show that but-for his age, he would not have been terminated.[62]

*Willard*, 952 F.3d at 807.  Yacko's membership in the protected group cannot, alone, support his

claim.  *See Downs v. Bel Brands USA, Inc.*, 613 F. App'x 515, 519 (6th Cir. 2015); *Sam Han v. Univ.*

*of Dayton*, 541 F. App'x 622, 626–27 (6th Cir. 2013).

Accordingly, the Court **GRANTS** GM's Motion for Summary Judgment on Yacko's claim

for age discrimination under Section 4112.02 (Count One).

### B.  Breach of Contract (Count Two)

In Count Two, Yacko alleges that GM prevented him from "having access to the employment

benefit of a termination wage buy-out," i.e., the VSP, and that GM's conduct therefore breached an

employment contract that entitled Yacko to participate in company benefits.  (Doc. No. 1-1 at ¶ 34.)

In its Motion, GM asserts that the VSP was not a contract for benefits, but rather an invitation

to apply for benefits.  (Doc. No. 27-1 at PageID #270.)  GM contends that it reserved the right to

approve or reject an application to the VSP based on the needs of the business.  (*Id.*)  Thus, GM

asserts that it was not until an employee offered to leave under the VSP, and GM accepted that offer,

---

Doc. No. 33-2 at PageID # 1346–56; Doc. No. 34-1 at PageID #1404–13.)  Further, Yacko asserts that other employees were given the chance for improvement plans prior to receiving formal discipline.  (Opposition at PageID #1329.)  Yet, by Yacko's own admission, most of his initial meetings were not filed as "formal disciplines" and thus were opportunities for Yacko to improve prior to formal disciplinary action—in the same way that a PIP allows an employee to do.  (Doc. No. 27-8 at PageID #640; Sipler Dep. at Tr. 34, 36–37.)  However, rather than seek the opportunity for improvement from these informal meetings, Sipler and Jewett testified that Yacko became "angry," "belligerent," "turned away from me," "yelled at me," "told us he was going to do … whatever the fuck he wanted to do," etc.  (Sipler Dep. at Tr. 34; Jewett Dep at Tr. 32.)  Finally, these arguments by Yacko merely constitute disagreement as to his employer's assessment of performance, which "does not render the employer's reasons pretextual."  *Brown*, 814 F. App'x at 81.

[62] The record reflects that the relevant GM witnesses did not consider age during any decision-making as to both Yacko's termination and Yacko receiving a teamGM minus rating.  (DeWildt Dec. at ¶ 2; Sipler Dec. at ¶ 13; Gaeschke Dep. at Tr. 36; Dixon Dec. at ¶ 10; Yacko Dep. at Tr. 134.)  Nor does Yacko point to any comments made by GM decision-makers in the workplace referencing his age that could suggest an adverse employment action on that basis.  *Cf. Willard*, 952 F.3d at 813 (referencing workplace comments that plaintiff was "over-the-hill," "old and fat," and "too old to sit at a front desk and a younger salesperson should sit there").  Finally, Yacko's "but-for" claim is undermined by the more than thirty GM Parma managers being older than him yet not receiving a teamGM minus rating.  (Motion at PageID #269.)

that a binding agreement would be formed.  (*Id.*)  In support of its argument, GM notes that no maintenance group leader in GM Parma left the business under the VSP, and that GM denied the application of the *only* person with that title because his skills as a maintenance supervisor were necessary to the operations of the plant.  (*Id.*)  Separately, GM also argues that Yacko's breach of contract claim fails because GM and Yacko were not parties to a contract, and that Yacko, as an at-will employee, has failed to identify any contract that it allegedly breached.  (Doc. No. 27-1 at PageID #269.)

In his Opposition, Yacko asserts that the VSP constituted a "fringe benefit" as defined by O.R.C. § 4113.15(D)(2), and that fringe benefits are components of an employment relationship and at-will contract even if they have not been used.  (Opposition at PageID #1333.)  Responding to GM's claim that the VSP was only an "invitation" to apply for benefits, Yacko contends that the VSP formed a unilateral contract which invited acceptance by performance rather than by a promise to perform.  (*Id.*)  Yacko points to Dixon's testimony characterizing the VSP as a "benefit that was part of the Workforce Reduction Program," and reiterates that the VSP was a fringe benefit created in January 2023, while Yacko was still employed, that attached to his at-will relationship with GM.  (Opposition at PageID #1333–34.)  Thus, Yacko asserts that the VSP benefit was "there to take," and that GM prevented Yacko from taking the benefit in breach of his at-will contract right to act on withheld fringe benefits.  (Opposition at PageID #1334.)

In its Reply, GM disputes the notion that the VSP was a unilateral contract that invited acceptance by performance.  (Reply at PageID #1427.)  GM concedes that some offers of severance can create a unilateral contract, such as where an offer of severance pay triggers a unilateral contract where acceptance occurs by the employee remaining employed after learning of the new severance

policy.  (*Id.*)  However, GM asserts that the VSP was not a unilateral contract because employees were required to apply for benefits under the plan and would only receive benefits if GM approved their application in exchange for their voluntary resignation from the company.  (*Id.*)  Finally, GM reiterates that Yacko was no longer an employee when the offer was made.

"Under Ohio law, the elements of a breach of contract claim are: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff as a result of the breach." *Asset Mgmt. One LLC v. U.S. Bank Nat'l Ass'n*, 569 F. App'x 438, 441 (6th Cir. 2014) (quoting *V&M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012)).

A unilateral contract "typically involves an offer made by a party which invites acceptance by performance rather than by a reciprocal promise to perform." *Mulvey v. GuideOne Mutual Ins. Co.*, 2017-Ohio-7902, 98 N.E.3d 926, ¶ 13 (10th Dist.) (citing *Bell v. Dimmerling*, 149 Ohio St. 165, 171, 78 N.E.2d 49 (1948)).  "When a company posts or otherwise disseminates to employees a written, formal employment policy, a unilateral contract may result."  *Mulvey*, 2017-Ohio-7902, at ¶ 13. Severance pay may be one permissible term of a unilateral contract.  *Id.* at ¶ 14.  But a unilateral contract "does not come into existence until one party to it has done all that is necessary on his part[, as] it is performance by one party which makes obligatory the promise of the other." *Bell*, 149 Ohio St. at 171 (citing 9 Ohio Jurisprudence 239, Section 5).

Where a voluntary separation plan requires filing an application that an employer has discretion to approve or deny, no unilateral contract is formed.  *See Lynch v. EG & G Mound Applied Technologies, Inc.*, 1999 WL 34790, at *5 (2d. Dist. Jan. 29, 1999).  In *Lynch*, a plaintiff's employer offered a VSP that required employees to file an application if they wanted to partake in the plan.  *Id.* at *1.  Specifically, interested employees would apply for the VSP, and management would review

the applications while considering the applicant's current position regarding "mission and objectives," "knowledge, skills, and abilities," "job performance," and other factors.  *Id.* at *1–2. After reviewing each application on a case-by-case basis, management would either approve or deny the VSP application.  *Id.*

The court determined that such a plan did not constitute a "unilateral contract offer" because participation in the VSP was not guaranteed simply upon submission of an application.  *Id.* at *5. Because management had the right to determine who would be permitted to participate in the program, no contract could be formed unless management affirmatively approved the application.  *Id.* This was true even where the employee's manager represented to him that he "couldn't imagine anybody being denied."  *Id.*  Although the manager predicted that the application was likely to be approved, his words, "[a]s a matter of law, … did not convey a unilateral contract offer of guaranteed acceptance into the VSP[] upon application."  *Id.*  Accordingly, summary judgment was appropriate for the employer as to the employee's breach of contract claim.  *Id.*

Here, the Court reaches the same conclusion as *Lynch*.  Just as in *Lynch*, GM reviewed VSP applications and either approved or denied them.  (Dixon Dec. at ¶ 19).  Out of the fourteen VSP applications submitted at GM Parma, GM approved thirteen and denied one—East.  (Dixon Dec. at ¶ 20; Doc. No. 27-6 at PageID #571–77.)  Notably, East was the only employee with the position "Group Leader – Maintenance" out of the fourteen applications, and his application was denied because GM deemed him "essential to the operation" of GM Parma.  (*Id.*)  Thus, there was no guarantee that Yacko, who held the same position as East, would have had his application approved. And even if Yacko was almost certain to have been approved, there would still be no unilateral contract because GM still had the final say in approval.  Therefore, because no unilateral contract was

offered for Yacko to have accepted by performance, there was no benefit that Yacko was entitled to that GM prevented him from taking.[63]

Yacko cites two cases in support of his claim for breach of contract as to the VSP—*Helle v. Landmark, Inc.*, 15 Ohio App.3d 1, 472 N.E.2d 765 (Ohio App. 6th Dis. 1984), and *Harwood v. Avaya Corp.*, 2007 WL 1574116 (S.D. Ohio May 25, 2007).  The Court finds *Helle* and *Harwood* to be distinguishable.  In *Harwood*, the employees received a retention bonus program ("RPB") offer in which they were to receive a retention bonus in exchange for remaining an employee of the company until a certain date.  2007 WL 1574116, at *1.  Thus, the offer explicitly invited acceptance by performance, and thereby created a unilateral offer.  Similarly, in *Helle*, the company put in place a severance policy that employees could choose to partake in, which contained a reservation clause that the company reserves the right to change or rescind the severance policy at any time.  472 N.E.2d at 769–70.  The plaintiff contacted the company manager to "verify" the severance policy, to which the manager responded, "You'll have it.  [You] should have [been] given [] the paper on it [the severance policy] (sic) already."  *Id.* at 770.  Thereafter, the plaintiff brought suit for breach of an *oral* contract.  *Id.* at 768.  The court explicitly acknowledged the company's argument surrounding the reservation clause as "legitimately within the realm of the employer's bargaining power," however, concluded that the oral assurances of severance pay from the manager "negate[d] the effect of disclaimers which are intended to absolve the employer from liability for unilateral alterations of or deviations from policies."  *Id.* at 774–75.  Thus, the Court finds that both programs created unilateral contracts, with

---

[63] Yacko cites to Dixon's deposition testimony in which she characterized the VSP as a "benefit that was part of the Workforce Reduction Program."  (Dixon Dep. at Tr. 32.)  However, as seen in *Lynch*, Dixon's mere characterization of the VSP cannot, "[a]s a matter of law, … convey a unilateral contract offer" because her characterization did not create a "guaranteed acceptance into the VSP[] upon application."  1999 WL 34790, at *5.

*Harwood* inviting acceptance by performance and *Helle* guaranteeing the severance pay pursuant to oral assurances from the manager, whereas GM's VSP did not because it was never guaranteed that GM would accept Yacko's application.  Therefore, *Helle and Harwood* are inapplicable.

Accordingly, the Court **GRANTS** GM's Motion for Summary Judgment as to Yacko's breach of contract claim (Count Two).[64]  (Doc. No. 27.)

### C.    Defamation (Count Three)

In Count Three, Yacko asserts that Gaeschke defamed him by "creating a false excuse for terminat[ing] Yacko's employment which he published to GM management [*sic*] for his own malicious purpose."  (Doc. No. 1-1 at ¶ 35.)  According to Yacko, Gaeschke's publishing to GM management that Yacko was fired for "behavior performance reasons" despite Yacko being a "loyal, subordinate professional employee . . . amounts to libel and slander."  (*Id.* at ¶¶ 8, 35.)

In his Motion, Gaeschke asserts that there is no evidence from which to conclude that Gaeschke made defamatory statements about Yacko.  (Motion at PageID #271.)  Further, Gaeschke contends that even if he could be found to have made a defamatory statement about Yacko, such statement would be protected by a qualified privilege.  (*Id.*)  Specifically, Gaeschke asserts that an act of alleged defamation is protected by qualified privilege if it occurs in a business or professional context by someone whose job gives them a legitimate interest in the matter.  (*Id.*)  Gaeschke submits that this includes a communication made in good faith between two employees concerning a third employee.  (*Id.*)  Finally, Gaeschke notes that such privilege can only be defeated if Yacko proves actual malice, which he cannot do.  (*Id.*)

---

[64] Because the Court finds that GM is entitled to summary judgment on Yacko's breach of contract claim based on Yacko not being guaranteed acceptance into the VSP, the Court need not address the Parties' remaining arguments on this claim.

In his Opposition, Yacko asserts that Gaeschke said Yacko was terminated for unexplained "behavioral performance" issues, which created "inuendo per se that he had mental health problems." (Opposition at PageID #1335.) Yacko points out that Gaeschke was the author of the information because the words "behavioral performance issues" do not appear in the GM termination script. (*Id.*) Yacko further asserts that according to Sipler's declaration, Yacko's "behavioral issues" were discussed at the HRM/SubHRM Meeting in front of at least a dozen GM employees. (*Id.*) Thus, Yacko contends that Gaeschke ruined his reputation because the HRM/SubHRM team acted on Gaeschke's defamatory "behavioral issues" statement to give Yacko his minus rating. (*Id.*) Finally, Yacko contends that Gaeschke's employer privilege defense rings hollow given GM's "refusal to cooperate in discovery and provide detailed information about who said what" in the HRM/SubHRM Meeting.

In his Reply, Gaeschke asserts that Yacko has no evidence that Gaeschke made a defamatory statement about him at the HRM/SubHRM Meeting. (Reply at PageID #1429.) Gaeschke notes that Yacko deposed three GM managers who attended the HRM/SubHRM Meeting, and not one of them testified that Gaeschke made any statements or words to that effect. (*Id.*) Rather, Gaeschke submits that it is undisputed that he made no statements about Yacko's performance at the HRM/SubHRM Meeting. (*Id.*) Gaeschke asserts that Yacko's claim is speculative at best, which is insufficient to survive summary dismissal. (*Id.*) Further, Gaeschke disputes the characterization that the phrase "behavioral performance issues … is code for 'mental health problems.'" (*Id.*) Finally, Gaeschke contends that even if Yacko had evidence that Gaeschke told other GM employees that Yacko had "behavioral performance issues," such a statement is protected by qualified privilege. (Reply at PageID #1429–30.)

In Ohio, defamation occurs "when a publication contains a false statement 'made with some degree of fault, reflecting injuriously on a person's reputation, or exposing a person to public hatred, contempt, ridicule, shame or disgrace, or affecting a person adversely in his or her trade, business or profession.'" *Am. Chem. Soc. v. Leadscope, Inc.*, 978 N.E.2d 832, 852 (Ohio 2012) (quoting *Jackson v. City of Columbus*, 883 N.E.2d 1060, 1064 (Ohio 2008)).  Generally, to establish a prima facie claim for defamation, a plaintiff "must show (1) that a false statement of fact was made, (2) that the statement was defamatory, (3) that the statement was published, (4) that the plaintiff suffered injury as a proximate result of the publication, and (5) that the defendant acted with the requisite degree of fault in publishing the statement." *Pincus v. Pincus*, 127 N.E.3d 393, 397 (Ohio App. 8th Dist. 2018) (citing *Am. Chem. Soc.*, 978 N.E.2d 832) (quotation marks omitted).[65]

The Court will address the disputed elements, in turn, below.

### 1.    False Statement

Turning to the first element of Yacko's prima facie defamation claim, as mentioned, Gaeschke contends that there is no evidence from which a jury could conclude that Gaeschke made defamatory statements to anyone about Yacko.  (Motion at PageID #271.)  In his Opposition, Yacko identifies the defamatory statement as Gaeschke's statement to GM's management that Yacko was terminated for "behavioral performance issues," which he asserts created an inuendo per se that he had mental

---

[65] Defamation can take the form of either slander or libel.  *Tharp v. Hillcrest Baptist Ch. of Columbus*, 204 N.E.3d 709, 723 (Ohio App. 10th Dist. 2022) (citation omitted).  "Slander" refers to "spoken defamatory words," while "libel" refers to "written or printed defamatory words."  *Id.* (citing *Savoy v. Univ. of Akron*, 15 N.E.3d 430 (Ohio App. 10th Dist. 2014)) (quotation marks omitted); *Burns v. Rice*, 813 N.E.2d 25, 32 (Ohio App. 10th Dist. 2004).  The prima facie elements are identical between the two forms of defamation.  *Tharp*, 204 N.E.3d at 723; *Mitchell v. Fujitec Am., Inc.*, 518 F. Supp. 3d 1073, 1090 (S.D. Ohio 2021) (citing *Fisher*, 153 N.E.3d at 624).  In this case, Yacko asserts both.  (Doc. No. 1-1 at ¶ 35.)

health problems.  (Opposition at PageID #1335.)  Gaeschke reiterates in his Reply that Yacko has no evidence that Gaeschke made a defamatory statement about him.  (Reply at PageID #1429.)

Neither party provides or cites to any authority as to what constitutes a "false" statement under Ohio law.  In a defamation action, a plaintiff must allege a false statement, an essential element of a prima facie claim.  *See Hartman v. Kerch*, 217 N.E.3d 881, 896 (Ohio App. 8th Dist. 2023).  A "false statement" is one that "sets forth matters which are not true," or "[s]tatements without grounds in truth or fact."  *Serv. Emp. Int'l Union Dist. 1199 v. Ohio Elections Comm.*, 822 N.E.2d 424, 430 (Ohio App. 8th Dist. 2004) (citation omitted) (alteration in original); *Labban v. Mahon*, 2021 WL 6777029, at *2 (6th Cir. Sept. 23, 2021) (citing *Susan B. Anthony List v. Driehaus*, 779 F.3d 628, 632 (6th Cir. 2015)).  A statement, therefore, is not a "false statement" if, "even though it is misleading and fails to disclose all relevant facts, the statement has some truth in it."  *Horenstein, Nicholson & Blumenthal, L.P.A. v. Hilgeman*, 178 N.E.3d 71, 106 (Ohio App. 2d Dist. 2021).

The Court concludes that Yacko has failed to prove that Gaeschke's statement to GM's management that Yacko was terminated for "behavioral performance issues" was false.  First, the Court disagrees with the notion that the phrase "behavioral performance issues" creates an inuendo per se that Yacko had mental health problems.  The record reflects that Yacko was not terminated for a lack of his technical-skills knowledge of GM's plant—rather, Yacko was terminated because he received a teamGM minus rating.  (Dixon Dep. at Tr. 29, 62; DeWildt Dep. at Tr. 32–33, 35, 41, 84–85; Gaeschke Dep. at Tr. 23, 30.)  Further, as explained above, the basis for Yacko's teamGM minus rating came as a result of numerous documented incidents involving Yacko's interactions with his co-workers and managers.  *See supra* **Sections 1.B, 1.C**.  Even if Yacko could reasonably dispute his teamGM minus rating, no reasonable jury could find the assertion that Yacko's termination was

related to his behavior to be "without grounds in truth or fact." *Serv. Emp. Int'l Union Dist. 1199*, 822 N.E.2d at 430. The statement that Yacko's termination was related to issues with his behavior at GM "has some truth to it," even if Yacko could show that "it is misleading and fails to disclose all relevant facts." *Horenstein, Nicholson & Blumenthal, L.P.A.*, 178 N.E.3d at 71.

Accordingly, the Court finds that Yacko has failed to show that Gaeschke's statement to GM concerning the reasons for Yacko's termination was false, and Gaeschke's Motion must be granted on this basis.

### 2. Qualified Privilege[66]

The Court has concluded that Yacko has failed to establish a prima facie case of discrimination. Nevertheless, even assuming *arguendo* that Yacko were able to prove that Gaeschke made a defamatory false statement about him, that statement would still be protected by qualified privilege.

One of the defenses to a prima facie case of defamation is privilege. *Hahn v. Kotten*, 331 N.E.2d 713, 718 (Ohio 1975); *see also Jackson v. City of Columbus*, 883 N.E.2d 1060, 1064 (Ohio 2008). A privileged communication is one which, "except for the occasion on which or the circumstances under which it is made, would be defamatory, and actionable." *Costanzo v. Gaul*, 403 N.E.2d 979, 981 (Ohio 1980). Privileged publications are divided into two general classes: "those

---

[66] Even if the Court determined that Gaeschke did make a defamatory false statement about Yacko, that statement would be protected under qualified privilege. Regarding the above discussion on this point, the Court only evaluates the statement made in front of Dixon while Yacko was being terminated. With respect to the publication element, while Yacko has put forth evidence that Gaeschke used the words "behavioral performance issues" while notifying him of his termination before Dixon, Yacko has pointed to no evidence that Gaeschke uttered these words, or anything akin, at the HRM/SubHRM Meeting. In fact, all three GM managers who attended that meeting and were deposed asserted that Gaeschke never spoke negatively about Yacko. (Dixon Dec. at ¶ 21; Sipler Dec. at ¶ 16; DeWildt Dec. at ¶ 5; Gaeschke Dep. at Tr. 22–23, 42, 45.)

which are absolutely privileged, and those which are qualifiedly or conditionally privileged." *Id.* An absolute privilege affords "complete protection," whereas "a qualified or conditional privilege affords protection only in the absence of ill motive or malice in fact." *Id.*

A publication is qualifiedly privileged when it is "fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs, in matters where his interest is concerned." *Hahn*, 331 N.E.2d at 718. Such a privilege "is recognized in many cases where the publisher and the recipient have a common interest, and the communication is of a kind reasonably calculated to protect or further it." *Id.* Thus, under Ohio law, "[e]ven a false statement may be protected by a qualified privilege." *Blesedell v. Chillicothe Telephone Co.*, 811 F.3d 211, 224 (6th Cir. 2016) (citing *City of Columbus*, 883 N.E.2d at 1064).

When a qualified privilege is asserted, courts must first determine whether the privilege indeed exists. *Fisher v. Ahmed*, 153 N.E.3d 612, 626 (Ohio App. 9th Dist. 2020) (citing *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 651 N.E.2d 1283 (Ohio 1995)). The essential elements of a qualified privilege are "good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only." *Hahn*, 331 N.E.2d at 719; *see also Buckner v. Gilliland*, 846 F. Supp. 2d 799, 804 (N.D. Ohio 2012) (citing *McNett v. Worthington*, 2011 WL 4790759, at *3 (Ohio App. 3d Dist. Oct. 11, 2011)). In the employment context, generally, "a communication made in good faith on a matter of common interest between an employer and an employee, or between two employees concerning a third employee, is protected by qualified privilege." *Sygula v. Regency Hosp. of Cleveland E.*, 64 N.E.3d 458, 467 (Ohio App. 8th Dist. 2016) (citation omitted). *See also Evely v. Carlon Co., Div. of Indian Head, Inc.*, 447 N.E.2d 1290, 1292 (Ohio 1983).

If a qualified privilege exists, the privilege can be lost if the communication is not "made in a reasonable manner and for a proper purpose," or is made to "someone outside of the qualified privilege." *Bisbee v. Cuyahoga Cnty. Bd. of Elections*, 2001 WL 204174, at *5 (Ohio App. 8th Dist. Mar. 1, 2001); *Stearns v. Ohio Sav. Ass'n*, 472 N.E.2d 372, 374 (Ohio App. 8th Dist. 1984); *Burrows v. Fuyao Glass Am. Inc.*, 2017 WL 626189, at *8 (S.D. Ohio Dec. 8, 2017). The privilege can also be lost when a plaintiff alleges actual malice. *Costanzo*, 403 N.E.2d at 983.

"Actual malice" is present when a statement is made "with the knowledge that the statements are false or with reckless disregard of whether they were false or not." *Id. See also Smith v. Klein*, 492 N.E.2d 852, 856–57 (Ohio App. 8th Dist. 1985); *Jacobs v. Frank*, 573 N.E.2d 609, 614 (Ohio 1991). "Reckless disregard" applies when "a publisher of defamatory statements acts with a 'high degree of awareness of their probable falsity,' or when the publisher 'in fact entertained serious doubts as to the truth of his publication." *City of Columbus*, 883 N.E.2d at 1064 (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964), and *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)) (internal citations omitted).

The Court concludes that Gaeschke has demonstrated that his statement would be entitled to qualified privilege. Gaeschke made the statement at issue to Yacko during his termination. (Yacko Dep. at Tr. 102.) In terminating Yacko, Gaeschke had a good faith reason as a matter of common interest for explaining the basis for Yacko's termination. Gaeschke did not act with actual malice because he did not have knowledge or reckless disregard as to whether the statement was false. As explained previously, Gaeschke was directly informed as to Yacko's various behavioral incidents during the HRM/SubHRM Meeting and acted on that basis. Therefore, even if Yacko could show

57

that Gaeschke had made a defamatory false statement about him, the statement would be protected by qualified privilege.

Accordingly, and for all the reasons set forth above, the Court **GRANTS** Gaeschke's Motion for Summary Judgment as to Yacko's claim for defamation (Count Three).

## V. Conclusion

For the reasons set forth above, the Court **GRANTS** Defendants' Motion for Summary Judgment.  (Doc. No. 27.)

**IT IS SO ORDERED.**

        *s/Pamela A. Barker*

PAMELA A. BARKER

Date:  December 26, 2024         U. S. DISTRICT JUDGE